UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARVIN PULLEN,

      Plaintiff,

  vs.

                              Case No.  13-CV-827

CARY G. HOUSE AND COLLEEN M.
MICHELSON, CITY OF MADISON

      Defendants.

---

## PLAINTIFF'S BRIEF IN SUPPORT OF SUMMARY JUDGMENT

---

### INTRODUCTION

This is a police excessive force case brought under 42 U.S.C. §1983 alleging false arrest and an excessive use of force in violation of the Fourth Amendment, a failure to intervene to prevent the use of excessive force, *Monell* liability against the city for inadequate training, supervision, and disciplining of officers House and Michelson which led to the other violations, as well as state tort claims for assault and battery.  Marvin Pullen ("Pullen") seeks summary judgment against the defendants on each of his federal claims.

Specifically, Pullen argues that summary judgment is warranted in this case as each officer used force when no force was justified.  Mr. Pullen was suspected of no crime or civil ordinance violation when his car was pulled over.  Both officers admit that the car was pulled over to check on the welfare of the teenagers within it after a citizen reported that a woman was striking the teens when they entered the vehicle but that the woman was not in the vehicle with them.  Pullen argues that because defendants did not

1

have probable cause or reasonable suspicion to arrest him for any wrongdoing, his arrest and any force used to arrest him were per se unreasonable. *See Reese v. Herbert*, 527 F.3d 1253, 1273 (11th Cir. 2008) ("In the absence of probable cause, [the officer] was not justified in using any force against [the plaintiff]."); *Gaddis v. Redford Twp.*, 364 F.3d 763, 772-74 (6th Cir. 2004) ("[E]ven minor uses of force are unconstitutionally excessive if they are totally gratuitous." (quotation marks omitted)). *Cf. Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("[P]olice officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.").

It is undisputed that neither officer told Pullen why he was stopped or asked about the welfare of the children in the car. Certainly, a simple, "Hey, we want to check on the kids in your car. Could you please step onto the grass while we do that," would have sufficed. Yet, while both officers testified that Pullen repeatedly questioned why he was stopped, neither would answer his question. Moreover, even though Pullen received no answers to his questions, he complied with Officer Michelson's command to get behind his vehicle and he continued to engage in peaceful dialog with the officers. It is undisputed that he did nothing to prevent either officer from checking on the welfare of the children within his car.

Pullen's failure to get off of his cell phone and his failure to identify himself are not crimes; therefore neither action justified his arrest or the use of force used against him. Because it is undisputed that Pullen did not threaten, kick, strike, yell profanities, or engage in any action toward the officers warranting force before the officers chose to use force with Mr. Pullen, any amount of force they used is per se excessive. Therefore, he is

entitled to judgment as a matter of law on his false arrest claim, his excessive force claims, his failure to intervene claim, and his *Monell* liability claim.

**STATEMENT OF FACTS**

Plaintiff's Proposed Findings of Fact (PPFOF), filed separately, are incorporated herein by reference. In addition, the most relevant are as follows.

On March 16, 2011, around 6:30 p.m., Marvin Pullen, a 52-year old African American, was called to pick up his then 14-year-old daughter and 17-year-old granddaughter from West Towne Mall, where the two juvenile girls had been cited for shoplifting.  (PPFOF ¶¶ 5, 7-8).  The mother of one of the girls, Nina Mitchell, separately arrived at the mall and was upset and emotional at the mall.  (PPFOF ¶ 6).  She created a disturbance warranting Officer Goehring to come out of the mall, hold her back, and ask her to control her behavior.  (PPFOF ¶¶ 9-11).  Once Officer Goehring returned into the mall, she again created a disturbance by smashing the girls' phones which was witnessed on the video feeds from inside the mall and immediately pointed out to Officer Goehring. He did not respond to those actions.  (PPFOF ¶ 12).  Later, he was notified by a citizen that Mitchell was possibly hitting the girls as they got into Pullen's car and that he drove away with the girls while Mitchell remained in the parking lot.  (PPFOF ¶ 18).  In response Officer Goehring reviewed the mall video footage and testified that what he saw did not constitute a crime without further investigation, as he could not see Mitchell hitting either child despite seeing her arms flailing.  (PPFOF ¶¶ 13, 19).

Officer Goehring then radioed dispatch and the other officers within the quadrant he was assigned and requested that Pullen's car be stopped solely to check on the welfare of the two children within it.  (PPFOF ¶ 19).  He admitted that he would have told

3

dispatch and his fellow officers that the alleged assailant was female and was not in the vehicle. (*Id.*).  Officer Michelson knew that the assailant was female when she pulled over Pullen's car. (PPFOF ¶ 26, 33).  The City of Madison has failed to preserve any evidence of what Officer Goehring radioed to dispatch and his fellow officers and therefore there is no written record of what he said when he radioed dispatch, a transmission that was heard by all of the other officers in his quadrant. (PPFOF ¶¶ 22-23, 39, 113).

**Michelson's stop of Pullen's vehicle.**   Shortly thereafter, Officer Colleen Michelson pulled Pullen's vehicle over for the purpose of investigating potential child abuse by Mitchell and to check on the welfare of the girls. (PPFOF ¶¶ 20, 25-26).  She admitted that she heard Goehring's dispatch while she was sitting in the parking lot of the police station on McKenna Blvd. (PPFOF ¶ 20).  When she pulled over the vehicle she admits it was dark outside. (PPFOF ¶ 25).  Her headlights lighted Pullen but also prevented him from seeing her clearly. (*Id.*)

Pullen was speaking on his cell phone at the time he was pulled over, and stepped out of his vehicle to attempt to explain the situation to the officer. (PPFOF ¶¶ 27-28).  Officer Michelson understood Pullen wanted to know why he was pulled over as she repeatedly testified that he continued to ask why he was pulled over. (PPFOF ¶ 31).  She also admitted that she never answered his question. (PPFOF ¶¶ 29, 31, 33).  Instead, she commanded Pullen to get back in his vehicle and get off of his phone. (PPFOF ¶ 29).  Again, Pullen attempted to explain the situation at the mall to the officer and/or asked why he was stopped. (PPFOF ¶¶ 31, 41).  Officer Michelson then commanded Pullen to get behind his vehicle and produce identification. (PPFOF ¶¶ 41-42).  Officer Michelson

did not identify herself to Pullen, nor did she explain why she had pulled Pullen over, nor did she ask about any children in the car.  (PPFOF ¶¶ 31, 33, 46).

Officer Cary House arrived at the scene as Pullen was complying with Officer Michelson's directive to get behind his vehicle.  (PPFOF ¶ 41).  Both officers testified that Pullen remained on his phone when he obeyed Michelson's command to walk behind his vehicle.  (PPFOF ¶¶ 41-43).  Officer House did not identify himself to Pullen, did not ask about any children in the car, or attempt to look inside the car to determine the welfare of the children.  (PPFOF ¶¶ 37-38, 40, 46-47).  Instead, Officers House and Michelson, immediately and without warning, grabbed at Pullen's arms.  (PPFOF ¶ 48).

Both officers admit that neither of them said anything to Pullen once they attempted to grab his arms and place him in handcuffs until after he was taken to the hospital.  (PPFOF ¶¶ 48, 58, 61, 75).  Both officers admit that Pullen was not suspected of any wrong-doing involving the children.  (PPFOF ¶¶ 48-49).  Both officers admit that at most Pullen was suspected of not obeying Michelson's commands to get off the phone, and to produce identification.  (PPFOF ¶ 49).  Both officers believed that a refusal to get off the phone and a refusal to produce identification are acts constituting the crime of resisting or obstructing arrest. (*Id.*).  Both officers' beliefs are a misstatement of the law as it has been in place since before either of them attended the police academy, as stated by the Supreme Court of Wisconsin in *Henes v. Morrissey*, 194 Wis. 2d 338, 353-354, 553 N.W.2d 802 (1995), holding that the resisting or obstructing statute cannot be used to justify and arrest or to charge one with a crime for failing to identify himself.

**The Officers Deploy Physical and Taser Force Against Pullen.**  Pullen tensed when the officers grabbed his arms, and Officer House responded by delivering a knee

5

strike to Pullen's stomach.  (PPFOF ¶¶ 50-52).  Upon delivering the knee strike, Officer House lost his balance and fell to the ground.  (PPFOF ¶ 52).  Pullen pulled back from Officer House and was backing away from him with his hands raised in a surrender position, while Officer Michelson still attempted to grab Pullen's arms.  (PPFOF ¶¶ 53-54).  Officer House got up from the ground brandishing his Taser as Pullen continued to back away.  (PPFOF ¶¶ 55-57, 59).  Without warning, Officer House deployed his Taser into Pullen's chest.  (PPFOF ¶ 61).  Pullen reacted by swinging his arms and attempting to pull the Taser's probes out of his body.  (PPFOF ¶ 62-63).  Then Officer Michelson deployed her Taser into the front of Pullen's body.  (PPFOF ¶ 64).

Pullen then began to stumble away from the officers and across the road.  (PPFOF ¶¶ 60, 65, 67-68).  Both officers followed Pullen, and Officer House deployed his Taser again into Pullen's back as he was stumbling away from the scene.  (PPFOF ¶ 69).  Pullen became incapacitated by the Taser and fell face forward onto the street, his face smashing onto the pavement as he hit.  (PPFOF ¶ 74).  He was unable to use his arms to break his fall.  (*Id*).

Officers House and Michelson admit that throughout this incident, Pullen never said anything threatening to either of them and never physically threatened her or anyone else.  (PPFOF ¶¶ 34, 46, 50, 53, 70).  Pullen never swung at them, never hit them, never punched them, never kicked them, never moved aggressively toward them, never took a fighting stance, and did not use profanity.  (PPFOF ¶¶ 53, 70).  Pullen never had, or appeared to have, any weapons.  (PPFOF ¶ 34).  Officers House and Michelson admit that at the time they Tased Pullen, he did not pose any immediate threat to either of them.  (PPFOF ¶¶ 46, 50, 53, 55, 59).  The witnesses did not observe Pullen saying or doing

6

anything threatening to Officers House and Michelson or anyone else.  (PPFOF ¶¶ 28, 30, 45, 60).

Officers House and Michelson say they Tased Pullen because he did not cooperate with commands to produce identification and "tensed" when officers attempted to put his hands behind his back.  (PPFOF ¶¶ 70-73).  The officers characterize what amounts, at most, being uncooperative during an investigative stop – investigating a potential crime in which he was not a suspect – as "actively resisting," though neither officer is aware of any Madison Police Department policy that so defines active resistance.  (PPFOF ¶ 70).  When Officers House and Michelson Tased him, their goal was to physically detain him with handcuffs to further their investigation.  (PPFOF ¶ 49, 70-73).

After the Tasings, Pullen was unable to get up by himself, and when officers pulled him off the pavement, his face was injured and there was "a lot" of blood on Pullen and on the street.  (PPFOF ¶ 76).  His injuries required surgery and stitches at the hospital.  (PPFOF ¶ 112).

**The Arrest.**  According to Officers House and Michelson, Pullen was not under arrest when they delivered a knee strike to his stomach and shot him three times with their Tasers.  (PPFOF ¶ 49).  Neither officer ever told Pullen he was under arrest at any time during this incident, prior to their arrival at the hospital.  (PPFOF ¶¶ 75, 81).  Neither officer warned Pullen that force would be used if he did not comply with their commands.  (PPFOF ¶¶ 48, 61).

Officers House and Michelson chose to arrest and cite Pullen for the misdemeanor crime of resisting, Wisconsin Statute § 946.41.  The District Attorney declined to pursue

any criminal charges against Pullen and dismissed the sole civil citation issued.  (PPFOF ¶¶ 83-84).

**Response by Officer House and Michelson's Supervisors.**   Neither Officer House nor Officer Michelson was questioned about the incident and what led them to use force against Pullen.  (PPFOF ¶ 87).  Neither officer was disciplined regarding the incident.  (*Id.*).

**Officer House and Officer Michelson's Use of Force Training.**  In their years as law enforcement officers, Officer House and Officer Michelson have received minimal training and instruction concerning use of force.  (PPFOF ¶¶ 109-111).  Officer House received no training on the appropriate escalation of force after the academy.  (PPFOF ¶ 109). Officer Michelson completed only one training on use of force after the academy, but it was likely after the incident in question.  (PPFOF ¶ 111).  Both officers' testimony during depositions demonstrate a lack of understanding of the circumstances justifying various levels of graduated force, in particular the circumstances in which deployment of a Taser is reasonable and necessary to accomplish their lawful duties.  (PPFOF ¶ 106-107).

Officer House and Officer Michelson have each also received training concerning use of Tasers specifically.  (PPFOF ¶¶ 109, 111).  Per the MPD manual, a Taser may be used "to overcome violent or assaultive behavior or its threat; if the officer reasonably believes that the subject poses an articulable threat of harm to an officer or to another person" and "to control persons in order to prevent them from harming themselves or others." (PPFOF ¶ 96).   An MPD officer may not Tase a person who is fleeing on foot unless other exigent circumstances are present. (PPFOF ¶ 96, 101).  The MPD Taser

policy specifically prohibits any use of a Taser on a person who is passively resisting. (PPFOF ¶ 96, 102).

## LEGAL STANDARD

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) *quoting* Fed. R. Civ. P. 56.   The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying those parts of the record and affidavits "which it believes demonstrate the absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   A party adverse to summary judgment "may not rest upon the mere allegations or denials of the pleadings, but the response…must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56.

In deciding a motion for summary judgment the court should not resolve factual disputes or weigh conflicting evidence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 153 (2000).   The Court may not in deciding a summary judgment motion evaluate the weight of the evidence, judge the credibility of witnesses or determine the truth of the matter.   The court's only role is to determine whether there is a genuine issue of fact for trial.   *National Athletic*, 528 F.3d 508, 512 (7th Cir. 2008), *citing Doe v. RR Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).

A factual dispute is genuine "only if a reasonable jury could find for either party," and disputed facts must be outcome-determinative to be "material" and preclude summary judgment. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). *See also Van Antwerp v. City of Peoria, Illinois*, 627 F.3d 295, 297 (7th Cir. 2010). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *Anderson*, 44 U.S. at 248.

## ARGUMENT

### I.   PULLEN WAS ARRESTED ON THE BASIS OF A MISTAKE OF LAW BY OFFICERS HOUSE AND PULLEN, AFTER HE WAS STOPPED WITH NO REASONABLE SUSPICION OR PROBABLE CAUSE OF COMMITTING ANY CRIME

The purpose of the stop of Pullen's vehicle was a child welfare check on the teens inside. Officer Michelson pulled Pullen's car over because it matched the description of the vehicle dispatch stated contained an individual possibly harmed in a physical altercation. (PPFOF ¶¶ 19, 26, 33)  At the time she pulled the vehicle over, Michelson knew it was a female who was alleged to have hit the girls and after the car stopped she saw Mr. Pullen was not female. (PPFOF ¶ 26).  Officers had neither reasonable suspicion that Pullen, who was known by officers to be the driver of the car, was involved in any crime, nor probable cause to support his warrantless arrest at any time. (PPFOF ¶ 19).

While there are disputes among the officers and Pullen as to what he said to the officers neither side's alleged words created probable cause or reasonable suspicion to arrest Pullen.  Pullen got out of his car and believes he said to Officer Michelson, "I kind of know why you stopped me.  Just let me explain." (PPFOF ¶ 28).  Officer Michelson and House believe Pullen continued to insist on an answer as to why he was pulled over.

(PPFOF ¶¶ 31, 47).  All witnesses agree Pullen initially walked toward Officer Michelson but stopped before reaching the end of his car.  (PPFOF ¶ 30).  Pullen believes he did not walk towards Officer Michelson, but closed his driver side door and stood next to the rear of his car.  (*Id.*).  All agree Officer Michelson ordered him to get off the phone.  (Pullen PPFOF ¶¶ 29, 32).  Pullen believes she yelled aggressively and he did eventually get off the phone.  (PPFOF ¶¶ 30, 32).

Once Officer House arrived Michelson ordered Pullen to step behind his vehicle and he complied.  (PPFOF ¶ 41).  All parties agree that Pullen did not threaten either officer, did not use profanity, and did not attempt physical contact with either officer in any way.  (PPFOF ¶¶ 36, 46, 50, 53, 70).  Certainly, Pullen never interfered with their ability to check his car and the welfare of the teens inside the car.  (PPFOF ¶ 46).  In fact, both officers describe Pullen as being preoccupied with his phone call and his request to know why he was pulled over.  (PPFOF ¶¶ 32, 41, 43).

There is a dispute of fact as to whether Pullen refused to produce identification or was simply slow to do so.  According to the defendants he was asked to produce identification but remained on the phone and refused to do so until officer Michelson explained why he was stopped.  (PPFOF ¶¶ 42-43). According to Pullen, when he reached for his identification both officers grabbed his arms.  (PPFOF ¶ 44).  The defendants admit that they both grabbed Pullen's arms shortly after he stepped to the back of his car.  (PPFOF ¶ 48).

Both officers tried to place Pullen in handcuffs without informing him he would be placed in handcuffs or identifying any violation of law as a basis for detaining Pullen. (PPFOF ¶ 48).  Neither officer spoke with each other before grabbing at Pullen making it

11

clear that they did not have an agreed upon basis to arrest or handcuff Pullen.  (PPFOF ¶ 40).  Both officers concede they did not speak to each other at all during the entire time they interacted with Mr. Pullen until he was taken to the hospital.  (PPFOF ¶¶ 40, 58).  Both officers later testified that they believed that a refusal to get off the phone and refusal to produce identification are acts constituting the crime of resisting or obstructing arrest.  (PPFOF ¶¶ 49, 70).

The Fourth Amendment's protection does not begin at the moment a citizen is handcuffed.  "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio,* 392 U.S. 1, 16, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968).  Seizures must be reasonable to pass constitutional muster. *State v. Brown,* 2014 WI 69, ¶ 19 (2014); *Whren v. United States,* 517 U.S. 806, 809-10 (1996).  A seizure can be based on probable cause or reasonable suspicion.  *Brown,* 2014 WI 69, ¶ 20.  A lawful seizure cannot be predicated upon a mistake of law.  *Id.* at ¶ 22.

The officers had no reasonable suspicion to detain or arrest Pullen.  Reasonable suspicion to justify a seizure exists if "the facts of the case would warrant a reasonable officer, in light of his or her training and experience, to suspect that the individual has committed, was committing, or is about to commit a crime." *Brown,* 2014 WI 69, 20, *quoting State v. Post,* 2007 WI 60, ¶ 8, 301 Wis. 2d 1, 733 N.W.2d 634.  "[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio,* 392 U.S. 1, 22 (1968); *Bies v. State,* 76 Wis. 2d 457, 472, 251 N.W.2d 461 (1977) (allowing for "a reasonable balance between individual privacy and the public interest in allowing the police a reasonable scope of action in the

12

discharge of their responsibility for general maintenance of peace and order in the community").

Whether reasonable suspicion exists to justify a seizure is determined by an objective standard: "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22. "[I]n the absence of reasonable suspicion, 'the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference,' because 'the risk of arbitrary and abusive police practices exceeds tolerable limits.'" *Henes v. Morrissey*, 194 Wis. 2d 338, 350, 553 N.W.2d 802 (1995) (quoting *Brown v. Texas*, 443 U.S. 47, 52 (1979)).

The officers had no probable cause to detain or arrest Pullen and Goehring conceded as much. (PPFOF ¶ 19). Probable cause exists when the officer has reasonable grounds to believe that the person is committing or has committed a crime. *Brown*, 2014 WI 69, ¶ 20. "Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Henes*, 194 Wis. 2d at 351, *quoting Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

The only basis for the stop of Pullen's vehicle was Officer Goehring's knowledge of the incident at the mall imputed to Officer Michelson and Officer House through the collective knowledge doctrine. *See United States v. Williams*, 627 F.3d 247, 252-253 (7th Cir. 2010). The collective knowledge doctrine "permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer

himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *Id.* at 252. "In order for the collective knowledge doctrine to apply, (1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information – or the agency for which he works – must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Id.* Here, Officer Goehring's knowledge of the events at the mall provided no reasonable suspicion to detain or arrest Pullen – instead, Goehring testified that he had only observed Pullen acting in a calm and cooperative manner. (PPFOF ¶¶ 8, 10). *See Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("[A]n otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.")

Pullen's actions during the stop did not create probable cause for an arrest. It is undisputed that Pullen's failure to comply with the officer's commands to stop talking on his cell phone and to provide identification was the basis for the officers' grabbing his arms. (PPFOF ¶¶ 42-49). However this basis was a mistake of law that does not justify his arrest. *Henes v. Morrissey*, 194 Wis. 2d 338, 354, 553 N.W.2d 802 (1995) ("We do not equate the failure to identify oneself with the act of giving false information…Mere silence, standing alone, is insufficient to constitute obstruction under the statute."); *State v. Hamilton*, 120 Wis. 2d 532, 542, 356 N.W.2d 169 (1984) (insufficient evidence to support conviction of obstruction where defendant, a potential witness, refused to provide officer identification during investigation).

In *Henes v. Morrissey*, two officers stopped Henes as he was walking along a highway in the early morning hours, believing him to be a suspect in a reported auto theft in the area. 194 Wis. 2d at 344. When Henes refused to identify himself during this investigatory stop, the officers arrested and charged him with obstructing their investigation pursuant to Wis. Stats. § 946.41. *Id.* After Henes' criminal case was dismissed for lack of probable cause, he brought a civil action against the officers alleging violations of his right to be free from unreasonable search and seizure under the Fourth Amendment. *Id.* at 344-45. The Supreme Court of Wisconsin rejected the argument that a refusal to provide identification when demanded by officers during a lawful investigatory stop constitutes obstruction under Wisconsin's criminal code. 194 Wis. 2d at 353 ("The obstruction statute cannot be used under these circumstances to arrest Henes for failing to identify himself. To do so would be contrary to the intended application of the obstruction statute as evinced by its own terms.").

Here, like in *Henes*, Pullen's actions during the stop did not create probable cause for an arrest. Pullen's failure to provide identification to Officer Michelson did not create probable cause for his arrest. *Id.* at 354 ("We do not equate the failure to identify oneself with the act of giving false information…Mere silence, standing alone, is insufficient to constitute obstruction under the statute"). Further, like in *Henes*, "the deputies have not shown how [the plaintiff's] refusal to identify himself 'obstructed' their investigation as required under the first element of the offense." *Id.* at 354. Pullen's refusal to identify himself did not delay the officer's investigation – the purpose of which was to check the welfare of the juveniles in Pullen's car in reference to allegations of child abuse by someone other than Pullen, who was not in the vehicle. *See id.* at 356 (distinguishing

*State v. Hamilton*, 120 Wis. 2d 532, 356 N.W.2d 169, on the basis that "[i]n *Hamilton*, the officers never testified that they suspected the defendant of a crime.  In fact in *Hamilton*, the defendant was more akin to a witness at the crime scene.").  "[N]ot every barrier placed in the path of an officer gives rise to a violation of sec. 946.41(1)." *Hamilton*, 120 Wis. 2d at 535.

Officers House and Michelson had no basis to detain or arrest Pullen at any time during the traffic stop.  Their initial attempts to detain Pullen were based on a mistake of law – that his refusal to provide identification was resisting or obstructing their investigation.  Because the officers had no legal basis to physically detain Pullen, they could not then charge him with resisting based upon his tensing his arms after they grabbed him: "[B]y its very terms, Wis. Stat. § 946.41(1) requires an officer to have 'lawful authority' before a citizen can be charged with resisting an officer." *State v. Annina,* 2006 WI App 202, ¶ 18, 296 Wis.2d 599, 723 N.W.2d 708.

## II.   THE PHYSICAL AND TASER FORCE USED AGAINST PULLEN WAS NOT REASONABLE BECAUSE HE WAS NOT SUSPECTED OF ANY WRONG-DOING, DID NOT POSE AN IMMEDIATE THREAT TO EITHER OFFICER, AND WAS NOT ACTIVELY RESISTING ARREST, AND  THEREFORE IT WAS EXCESSIVE.

Officers House and Michelson used excessive force against Marvin Pullen when they chose to knee strike him and Tase him twice in the front and once in the back, without warning simply because Pullen, a non-threatening 52-year-old man, stepped out of his vehicle after his vehicle was pulled over to investigate a potential child abuse situation in which he was not considered a suspect, and he did not immediately produce identification when asked.  The officers deployed this significant, intermediate level of

force capable of causing serious injury or death, despite neither suspecting nor witnessing any criminal action or threat of harm by Pullen.

That the deployment of a Taser against a nonviolent misdemeanant who is not actively resisting is a Fourth Amendment violation is clearly established in the Seventh Circuit. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010); *Abbott v. Sangamon Cnty*, 705 F.3d 706, 732 (7th Cir. 2013) (finding this rule well-established in 2007).

Use of excessive force by police officers during an investigatory stop constitutes a Fourth Amendment violation actionable under 42 U.S.C. § 1983. *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996). The Fourth Amendment, as applied to the states by the Fourteenth Amendment, protects against unreasonable seizures. *Graham v. Connor, 490 U.*S. 386, 394 (1989). Determining whether force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Proper application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the

arrest." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012) (citing *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009)).

The court also considers whether the citizen was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties. *Jacobs v. City of Chicago*, 215 F.3d 758, 773, (7th Cir. 2000). The excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger he posed – to the community or to the arresting officers – if left unattended. *Id.* (quoting *McDonald v. Haskins*, 966 F.2d 292, 292-93 (7th Cir. 1992)). Where the offense of arrest is a misdemeanor, and where the individual is not exhibiting violent behavior, a lesser degree of force than a Taser is reasonable. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (citing *Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) (noting that a lesser degree of force is reasonable when the offense of arrest is not committed violently)). "Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of … force." *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993).

The reasonableness inquiry in an excessive force case is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. An officer's good intentions will not make an objectively unreasonable use of force constitutional. *Id.* "Even when officers' goals are eminently reasonable, there are definite limits to the force officers may use to prod arrestees into obeying commands. A rule that pins reasonableness on whether officers

18

used the force necessary to secure compliance would be a rule that *requires* officers to beat non-resisting arrestees into submission." *Phillips*, 678 F.3d at 527.

In this case Pullen was suspected of, at most, a non-violent misdemeanor for obstruction, because he would not provide his identification.  He never posed an immediate threat to either officer's safety and he never actively resisted or attempted to evade arrest as each officer concedes he was not under arrest at the time of each tasing.  Give that all three *Graham* factors weigh in favor of Pullen, the amount of force used against him was, per se, excessive.

### A.  Because There Was No Probable Cause To Arrest Marvin Pullen, Any Force Used Against Him Was Excessive.

If police officers who do not have probable cause or reasonable suspicion to arrest an individual for wrong-doing use force, any force used to arrest the individual and his arrest are per se unreasonable.  *See Reese v. Herbert*, 527 F.3d 1253, 1273 (11th Cir. 2008) ("In the absence of probable cause, [the officer] was not justified in using any force against [the plaintiff]."); *Gaddis v. Redford Twp.*, 364 F.3d 763, 772-74 (6th Cir. 2004) ("[E]ven minor uses of force are unconstitutionally excessive if they are totally gratuitous."  (quotation marks omitted)).  *Cf. Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("[P]olice officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.").

As established above, the officers had no justifiable basis to arrest Pullen at the time they grabbed his arms to handcuff him.  Notably, both officers also admit that Pullen was not under arrest and not suspected of committing any offense other than obstructing. (PPFOF ¶¶ 49, 75, 81).  Both officers believed that a refusal to get off the phone and refusal to produce identification are acts constituting the crime of resisting or obstructing

arrest, (PPFOF ¶¶ 42-49); these beliefs are a misstatement of the law as it has been in place since before either of them attended the police academy. *See Henes,* 194 Wis. 2d at 353-354.  Thus, Officer Michelson and House's use of force to handcuff Pullen without probable cause constitutes the use of excessive force.  Police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever. *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996).

### B.   The Knee Strike Delivered by Officer House Was Excessive Force.

"It is clear…that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Clash*, 77 F.3d at 1048. Once the officers grabbed Pullen's arms they described his response as tensing up his arms in response.  (PPFOF ¶ 50).  Both officers admit that Pullen did not try to harm either officer in response to their grabbing of his arms. (*Id*.)  Without provocation, Officer House then delivered a knee strike to Pullen's abdomen.  (PPFOF ¶ 52).

In *Clash v. Beatty*, the Clash family was pulled over after reports of a child playing with a gun in their vehicle in the parking lot of a grocery store.  77 F.3d at 1046. The driver, Henry Clash, was instructed to get out of the vehicle, was handcuffed and searched for weapons, which police did not find on his person.  *Id.*  A search of the vehicle resulted in finding only a toy gun.  *Id.* 1046-47.  Officer Beatty then escorted Clash, still handcuffed, to a police car and shoved him inside the car, causing Clash to injure his knee.  *Id.* at 1047.  No one was arrested or charged with any crime as a result of the police stop.  *Id.*  Clash filed suit against the officers alleging excessive force, and the district court denied summary judgment to the officers on the basis of qualified immunity, concluding that "[i]f the shove was wholly gratuitous, it may have constituted

20

such an 'elementary violation' of the Fourth Amendment that plaintiff need not show a precisely analogous case." *Id.*

Here, like in *Clash*, the officers had no basis to use physical force against Pullen. Pullen was not suspected of any wrongdoing, and was not thought to have any weapons. Even viewing facts in favor of the officers, they did not warn Pullen that they were attempting to arrest or handcuff him before grabbing his arms.  Thus the tension officers felt in Pullen's arms could have been an automatic physical response to the shock of having the officers suddenly grab him.  These facts show no provocation that would justify the use of a knee strike by Officer House.

Clearly, delivering a knee strike to a man who is not suspected of any wrongdoing, who has not interfered with the officer's ability to check on the teens in the car, who obeyed the officer's command as to where to stand, and who is clearly communicating verbally with the officers with reasonable requests for information, constitutes excessive force.

### C.  The Three Taser Strikes By Officers House and Michelson Were Excessive Force.

The law is clear that police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure are not immunized from the use of excessive force.  *Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993).  The escalation of force utilized by House and Michelson beginning with House administering a knee strike and then both officers discharging their Tasers in Pullen, House twice, was not in proportion to the threat posed by Pullen.

All parties agree that House lost his balance and fell to the ground after he delivered a knee strike to Pullen's abdomen.  (PPFOF ¶ 52).  All parties agree that Pullen

never moved toward House in any way, did not attempt to harm either officer at this time and Michelson and Pullen agree that Pullen stepped back a few steps either on his own or with the assistance of Officer Michelson.  (PPFOF ¶ 53-55).

Without provocation, Officer House got up from the ground, removed his Taser from its holster, pointed it at Mr. Pullen, did not communicate with Officer Michelson verbally, did not communicate with Mr. Pullen warning him that he would Taser him if he did not comply with a specific command, and instead shot his Taser at Mr. Pullen aiming directly at his chest, a prohibited action pursuant to Officer's House' training. (PPFOF ¶¶ 53-59, 96).

Shooting a Taser at an unarmed individual who is not presenting any resistance at the time of the deployment constitutes excessive force.  This initial shot is even more troubling if you believe Mr. Pullen and his granddaughter who both testified that Mr. Pullen backed away with his hands above his shoulders in surrender mode once Officer House fell to the ground.  (PPFOF ¶¶ 54, 59-60).  Moreover, Morrison testified that Officer House got up off the ground and looked very angry; shooting in anger rather than in conformity with the law.  (PPFOF ¶ 56 ("He was calling for backup by the time he was getting up.  He was mad, and I don't know what he said…I know he was calling for backup. … he had to call for backup, and by that time he was mad and upset so he tased him.")).

Again, the law is clear, that when no force is necessary, any force used constitutes excessive force.  *Phillips*, 678 F.3d at 527.  Even to the extent that the officers believed the knee strike was necessary, both officers concede that at the time of the first Taser strike neither officer was holding Mr. Pullen and Mr. Pullen did not present any danger to

either officer.  (PPFOF ¶¶ 55, 59).  He did not strike, shove, hit, kick, or attempt to do any of those things to either officer.  (*Id.*)  He did not attempt to flee.  (*Id.*)  It is clear that Pullen "was never 'actively resisting arrest,' a touchstone of the *Graham* analysis." *Phillips*, 678 F.3d at 525 (reversing judgment in favor of officers who repeatedly shot baton launcher at suspect who failed to exit vehicle on command).  "To the extent that [plaintiff's] perceived conduct could be considered 'resistance' at all, it would have been passive noncompliance of a different nature than the struggling that we have found warrants escalation of force."  *Id.*

After the first Taser strike Pullen reacted as an officer trained to deploy a Taser would expect if the deployment was not fully successful.  (PPFOF ¶ 99).  He began to swing his arms and in doing so he pulled the prongs out of his chest while backing further into the street and toward the front of his car.  (PPFOF ¶¶ 62-63).  Then Officer Michelson deployed her Taser at Pullen and he responded by turning away from the officers and stumbling away across the street.  (PPFOF ¶¶ 64-65, 67).

While there is a dispute of fact between the two officers about where Pullen headed, both agree he was stumbling away from the scene and both agree that Officer Michelson chose to pursue him on foot to stop him from doing so.  (PPFOF ¶¶ 67-68, 71-73).  It is within this framework that Officer House deployed his Taser for a second time into Mr. Pullen's back as he fled.  (PPFOF ¶ 69).  Pullen became incapacitated by the Taser and fell face forward onto the street, his face smashing onto the pavement as he hit, as he was unable to use his arms to break his fall.  (PPFOF ¶ 74).

Madison Police Department policy forbids the use of a Taser on individuals engaging in only passive resistance, and provides that it is a permissible use of force only

"under the following circumstances: (a). To overcome violent or assaultive behavior or its threat; if the officer reasonably believes that the subject poses an articulable threat of harm to an officer or to another person. (b). To control persons in order to prevent them from harming themselves or others."  (PPFOF ¶ 96, 102).  It also prohibits the use of a Taser on an individual feeling on foot unless exigent circumstances are present.  (PPFOF ¶ 96).  And the MPD Taser training clearly defines exigent circumstances in this situation as a situation in which the officer believes that the individual will pose an immediate risk to public if not immediately apprehended.  (PPFOF ¶ 101).

In *Cyrus v. Town of Muckwonago*, the Seventh Circuit addressed the use of a Taser against an individual who "had, at most, committed a misdemeanor offense under Wisconsin law, and [who] was not exhibiting violent behavior," reversing a grant of summary judgment to officers on the basis that a jury could conclude such a use of force was excessive in light of the *Graham* factors.  624 F.3d 856, 863 (7th Cir. 2010).  In that case, officers responded to a report that a mentally ill man had trespassed inside a new home under construction.  *Id.* at 857-58.  When Cyrus did not respond to police commands and turned his back on the officer, possibly attempting to again enter the private home, the officer Tased him in the back.  *Id.* at 859.  The officer then Tased him at least five more times while he was stumbling and or on the ground, in order force Cyrus to comply with commands to put his hands behind his back for questioning.  *Id.* at 859-60.  In addition to not being suspected of a serious or violent crime, officers had no suspicion that Cyrus was armed, and "[a]s importantly, there [was] no evidence suggesting that Cyrus violently resisted the officers' attempts to handcuff him."  *Id.* at 863.

It is undisputed that here, like in *Cyrus*, the officers did not suspect Pullen of committing a felony or violent crime, but at most of not providing his identity and tensing his arms when they attempted to handcuff him rather than respond to his questions. It is undisputed Pullen posed no immediate threat to the officers or anyone else. Officers House and Michelson admit that throughout this incident Pullen never said anything threatening to either of them, nor did he ever physically threatened anyone else. (PPFOF ¶¶ 34, 46, 50, 53, 70). Pullen never swung at them, hit them, punched them, kicked them, moved aggressively toward them, took a fighting stance, or even used any profanity. (PPFOF ¶¶ 53, 70).

Additionally, the fact that the officers deployed multiple Taser shocks adds to the lack of reasonableness under the *Graham* analysis. The Seventh Circuit addressed the argument in *Cyrus:*

> Defense counsel suggested … that if [an officer's] first use of a Taser was reasonable, all other uses were necessarily appropriate because once an officer is justified in using a particular level of force to effectuate an arrest, he can continue to use that same level of force until the suspect is apprehended. ***Not so. Force is reasonable only when exercised in proportion to the threat posed****, see also Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) ("Quite simply, though the initial use of force (a single Taser shot) may have been justified, ***the repeated tasering … was grossly disproportionate to any threat posed and unreasonable under the circumstances***."), and as the threat changes, so too should the degree of force, *see Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Force also becomes increasingly severe the more often it is used; striking a resisting suspect once is not the same as striking him ten times. It's the totality of the circumstances, not the first forcible act, that determines objective reasonableness.

*Cyrus*, 624 F.3d at 863. Although in this case, Officer House's first use of the Taser was *not* reasonable, this admonition in *Cyrus* is also applicable here – each Taser deployment

became more and more unreasonable as Pullen backed and then stumbled away from the officers after each deployment.

Because the officers lacked probable cause to arrest Pullen of any crime, any use of force against him was excessive. Yet even if a factual dispute exists as to whether the initial force of Officer House's knee strike was necessary and reasonable, the use of a Taser against Pullen was unnecessary and unreasonable because Pullen presented no threat to the officers. Likewise, even if a factual dispute exists as to whether the first Taser shock was necessary and reasonable, it is undisputed that repeating the Taser shocks another two times was unnecessary and unreasonable. Because – at the very least – the third Taser shock to Pullen's back as he was undisputedly stumbling away from the officers was excessive, and in violation of MAPD policy on the use of a Taser. Pullen is entitled to summary judgment on this claim.

### III. OFFICER MICHELSON VIOLATED PULLEN'S CONSTITUTIONAL RIGHT TO BE FREE FROM EXCESSIVE FORCE BY FAILING TO INTERVENE AND PREVENT OFFICER HOUSE FROM USING EXCESSIVE FORCE.

Police officers have a clear duty to intervene, and may not ignore when their fellow officers violate the constitutional rights of a suspect or other citizen. *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). The constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows. Thus an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a

26

deprivation of his Fourth Amendment rights.  *Yang v. Hardin*, 35 F.3d 282, 285 (7th Cir. 1994).

An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: "(1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring."  *Yang*, 37 F.3d at 285.  "[A] 'realistic opportunity' to intervene may exist whenever an officer could have 'called for backup, called for help, or at least cautioned the excessive force defendant to stop.'"  *Abdullah v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Yang*, 37 F.3d at 285).

Here, Officer Michelson testified that she let Pullen go when she saw House remove his Taser from its holster as she knew he was going to deploy his Taser.  (PPFOF ¶¶ 57-58).  She also knew Pullen posed no threat to the officers at that moment but she remained silent.  Michelson could have commanded and warned Pullen to keep his hands in the air or he would be Tasered.  Alternatively, she could have alerted House to the fact that it was not an appropriate situation for the Taser by stating, "wait, he's cooperating now."  But, she remained silent and even testified that she approved of House's use of his Taser in this situation.  (PPFOF ¶ 58).

Just as in *Abdullah*, Officer Michelson was only a few feet away from Officer House when he delivered a knee strike and then tased Pullen, and she should have known that he was doing so in violation of standard MPD policy.  *Abdullah*, 423 F.3d at 774 (noting that the fact that officers were "mere feet away" from the officer delivering the

force in question, and that that officer's efforts to restrain the individual violated standard police practices could support a finding that the officers had an opportunity to intervene).

Because Officer Michelson initiated the confrontation as the first officer on the scene, her duty to keep the arrest from getting out of hand is particularly clear.  (PPFOF ¶ 40).  But she did nothing when House struck Pullen and Tased him.  That Michelson was the officer in charge was also apparent after the third tasing when Officer Michelson took the lead to handcuff Pullen and to rummage through his pockets and turn him over. (PPFOF ¶¶ 75-77).

Because, as established above, Pullen was unjustifiably arrested and the knee strike and Taser shocks deployed by Officer House were excessive force in violation of Pullen's Fourth Amendment rights, Officer Michelson had a duty to intervene to prevent these violations from occurring.  And, Officer Michelson, standing only feet from Officer House and as the officer in charge of the traffic stop, had a realistic opportunity to intervene and prevent harm from occurring to Pullen prior to the officers grabbing his arms and Officer House delivering a knee strike, and prior to Officer House deploying his Taser the first and second time.  That Officer Michelson ignored this duty to intervene with respect to each violation makes her liable for each as a matter of law.

## IV.   *MONELL* LIABILITY

Summary judgment is also appropriate against the City of Madison ("the City"), because its failure to train and supervise Officers House and Michelson was the moving force behind the violation of Pullen's constitutional rights by these employees.  *Monell v. Dept. of Social Svcs. of City of New York*, 436 U.S. 658, 692 (1978); *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007).  In their years as law

28

enforcement officers, Officer House and Officer Michelson received minimal training and instruction from the City concerning use of force.  In fact both officers' testimony demonstrated a lack of understanding of when graduated uses of force were reasonable, particularly with respect to the use of a Taser against an individual.  Additionally, in this case and others, the City has failed to ensure that the use of Tasers by its employees is properly investigated by their supervisors to ensure appropriate levels of force are used.

A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010), *citing Monell*, 436 U.S. at 690; *Valentino v. Village of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009).  The first question is whether there is a casual link between the municipal policy or custom and the constitutional violation.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S. Ct. 1197 (1989).  Next, one focuses on the adequacy of the training program in relation to the tasks the particular officers must perform. *Id.*  Liability attaches when a municipality's failure to train, supervisor or discipline exhibits deliberate indifference to the constitutional rights of its inhabitants.  *Id.*

Here, the use of excessive force by Officers Michelson and House was caused by the City's practice or custom by which policymakers were "deliberately indifferent as to [the] known or obvious consequences" of inadequately training, supervising, and investigating its officers on the appropriate use of force as it relates to physical force and Tasers.  *Id.*, *quoting Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir.

2002). Deliberate indifference may take the form of an implicit policy or a gap in expressed policies, *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006), *citing Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005), or "a series of violations to lay the premise of deliberate indifference." *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) (citations omitted). Additionally, as Justice O'Conner stated in her part concurrence part dissent in *City of Canton*, a deliberate indifference in a failure to train,

> could be shown that the need for training was obvious in one of two ways. First, a municipality could fail to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face. As the majority notes, see *ante*, at 390, n. 10, the constitutional limitations established by this Court on the use of deadly force by police officers present one such situation. The constitutional duty of the individual officer is clear, and it is equally clear that failure to inform city personnel of that duty will create an extremely high risk that constitutional violations will ensue.
>
> ….
>
> Second, I think municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion. In such cases, the need for training may not be obvious from the outset, but a pattern of constitutional violations could put the municipality on notice that its officers confront the particular situation on a regular basis, and that they often react in a manner contrary to constitutional requirements.

*City of Canton*, 489 U.S. at 396-97.

The City's deliberate indifference is demonstrated by the fact that neither Officer Michelson nor House could recite a prior training they received after their academy training that discussed the appropriateness in the use of force. (PPFOF ¶¶ 109, 111). Neither officer completed additional training beyond the initial course on Tasers. (*Id.*)

Astonishingly, Officer House admitted that after he graduated from the academy he never participated in the five week ride along with a more seasoned officer training which would have enabled him to be supervised in his job while on the job.  (PPFOF ¶ 108).  Instead, he was given his gun, his badge, his Taser, and his vehicle to patrol our city solo.  (*Id*.)

The lack of, or insufficient training on Tasers and use of force is directly related to Officer House and Michelson's job duties responding to incidents and interacting with citizens on a daily basis.  Yet this training left the officers unable to explain when to use force as compared with the MAPD policy 6-200 on use of nondeadly force, (PPFOF ¶ 107); provide as little as a sentence into the material covered by a subsequent training involving the appropriateness of the use of a Taser, (PPFOF ¶ 106); or accurately state what MAPD policy 6-200 provided with regard to the use of a Taser on a fleeing subject.  (PPFOF ¶¶ 70-73, 106).  The fact that neither officer could say anything more than a generalized, rudimentary statement about the use of force speaks volumes as to the inadequacy of their training in the use of force, and is directly linked to the excessive force violation suffered by Pullen.

For example, MAPD policy 6-200 specifically states only under exigent circumstances is the use of force justified against a fleeing suspect.  (PPFOF ¶ 96).  But neither Michelson nor House detailed exigent circumstances justifying the use of a third Taser shot.  House claimed he fired because Pullen turned toward Michelson, but Michelson denies that Pullen turned toward her, (PPFOF ¶ 68, 70-73), and both officer concede that Michelson was proactively moving to contact Pullen regardless of his movements.  (PPFOF ¶ 72).  Moreover, both agree Pullen was sufficiently affected by the

31

other taser shots that he was characterized as "stumbling."  (PPFOF ¶ 67).  Clearly, tasing a "stumbling" citizen unsuspected of any wrong-doing would be inappropriate under the MAPD policy which prohibits the use of a Taser against a fleeing *suspect* unless exigent circumstances are present. Pullen was never a *suspect*; stumbling can hardly be characterized as fleeing; and there were no exigent circumstances given he was unarmed, stumbling, not a suspect, and at most was uncooperative with providing his name, getting off of his phone, and tensing his arms when he was unexpectedly grabbed by both officers.

The City has also shown deliberate indifference by its failure to adopt appropriate procedures to deal responsibly with complaints of police brutality, and evidence of their failure to make reasonable investigations of such complaints.  In the case of Officer Michelson, this deliberate indifference is demonstrated by the fact that she had two incidents using her Taser against an individual, in which that individual later complained the force was excessive.  Yet no supervisor had ever spoken with Officer Michelson about either incident, nor was she aware of any investigation into either incident. (PPFOF ¶¶ 87-89).  Documents provided by the City show no evidence of any investigation occurring.  (*Id.*)  Additionally, Officer Michelson testified that she was unaware of all of the civilian complaints against her except one.  (PPFOF ¶¶ 88-89). Likewise, House could not identify an occasion when he was told of a citizen complaint for purposes of investigating the complaint, despite a previous complaint regarding excessive force being made against him.  (PPFOF ¶¶ 90-91).

The City has a policy, practice, or custom of failing to communicate regularly with its employees when complaints are made.  When the city routinely and systematic

32

fails to address the citizen complaint with an officer, it cannot be said to have properly or fully investigated a citizen complaint. Between Michelson and House the City has identified 15 complaints. (PPFOF ¶¶ 88-91) Yet each officer was only aware of one of the complaints respectively. Thirteen of the 15 complaints were never brought to the attention of these officers.

Finally, the City's disciplinary response to Officer House's admitted criminal behavior shows further deliberate indifference to supervising its officers. Officer House was initially charged with two misdemeanor counts, stemming from an event in which he and a convicted felon were shooting guns - including Officer House's police service firearm - off of House's patio at his residence while intoxicated. (PPFOF ¶ 93) While Officer House eventually pled guilty to an amended forfeiture citation of disorderly conduct, he admitted that the facts making up the criminal complaint were true. (PPFOF ¶¶ 93-94) In response, the City issued a letter of reprimand, suspended House for twenty days, and held another ten-day suspension in abeyance. (PPFOF ¶ 93) This evidence shows a clear pattern of a failure to investigate and properly discipline or retrain officers.

The above facts support summary judgment on Pullen's *Monell* liability claim as they show systematic lapses in training and supervision of its officers in such areas where those lapses are likely to result in violations of a citizen's constitutional rights. Because the City, as general practice and/or widespread custom, failed to properly train its employees regarding the use of force, and routinely failed to investigate complaints of excessive force after the fact, it directly led to and is liable for violating Pullen's constitutional rights.

33

## V.  DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants answer to the amended complaint contends that at the time they utilized force to arrest Pullen they reasonably believed that Pullen was obstructing them in the performance of their duties and therefore, Pullen's claims against them should be dismissed. In order to determine whether the officers are entitled to qualified immunity, the court examines the facts in the light most favorable to Pullen' and evaluates whether probable cause existed as it would appear to the reasonable police officer. *Payne v Pauley*, 337 F. 3d 767, 776 (7th Cir. 2003). The officers attempted to handcuff Pullen because they believed he was obstructing them by not providing his identity. The law in Wisconsin was well established that Pullen's refusal to identify himself did not constitute obstructing law enforcement officers. *Henes v Morrissey*, 194 Wis. 2d 338 (1995) The annotations to Wis. Stat. § 946.40 specifically state that "No law allows officers to arrest for obstruction on a person's refusal to give his or her name. Mere silence is insufficient to constitute obstruction."

Pullen is not alleged to have engaged in any other conduct that obstructed the officers' investigation into whether the teens in the car had been abused. Pullen did not attempt to keep the officers away from the car or attempt to prevent the officers from talking to the car's occupants. The officers did not suspect that Pullen had committed any offense or was in the process of committing an offense or posed a threat to them or anyone else. On these facts a reasonable officer would know that there was no probable cause to arrest Pullen and that any use of force was unreasonable.  *Graham*, 490 U.S. at 396.

The law also was well established that "Force is reasonable only when exercised in proportion to the threat posed." *Cyrus v. Town of Mukwonago*, 624 F. 3d 856, 863 (7th Cir. 2010); *Abbott v. Sangamon Cnty*, 705 F.3d 706, 732 (7th Cir. 2013) (finding it clearly established that using a a Taser against a nonviolent misdemeanant is excessive force); *Phillips*, 678 F.3d at 525 (distinguishing passive noncompliance with officer commands from circumstances justifying use and escalation of force); *Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure are not immunized from the use of excessive force); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("[P]olice officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.")..

Pullen had committed no offense; he was not exhibiting violent behavior, and did nothing to prevent the officers from talking to the teens in the car. He did not struggle with the two officers when they grabbed his hands and he backed away from Officer House with his hands up after House fell down as a result of delivering a knee strike to Pullen's abdomen.  Pullen did not shout or yell, or utter profanities and make threatening gestures when House fell to the ground, nor did he attempt to flee. Nonetheless, House brandished his Taser and contrary to department policy stood up and shot Pullen in the chest. House made no verbal commands and according to Morrison, House looked angry. Despite being stunned and stumbling away from the officers, the two officers Tasered Pullen in the back causing him to fall face down in the street. Pullen clearly has provided specific evidence that the officers used objectively unreasonable force under the circumstances. *Cyrus v*, 624 F. 3d at 864.

## CONCLUSION

For the foregoing reasons, Plaintiff asks the court to grant his motion for summary judgment on each of his federal claims.

Dated this 2nd day of December, 2014

DAVEY & GOLDMAN
Attorneys for Plaintiff
Marvin Pullen


/s/ Lisa C. Goldman
Bruce M. Davey SBN: 1012256
Lisa C. Goldman, SBN: 1029893
7609 Elmwood Ave., Suite 203
Middleton, WI 53562
Phone (608) 833-2603
Fax (608) 205-5645
lgoldman@daveygoldman.com


LOHR LAW OFFICE LLC
Attorneys for Plaintiff
Marvin Pullen

Jennifer A. Lohr SBN:  1085725
222 S. Hamilton St., Suite 21
Madison, WI  53703
Phone (608) 515-8106
Fax (866) 316-0737
jlohr@lohrlawoffice.com