UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARVIN PULLEN,

              Plaintiff,

GROUP HEALTH COOPERATIVE OF         Case No:  13-CV-00827
SOUTH CENTRAL WISCONSIN

v.

CARY G. HOUSE AND COLLEEN M.
MICHELSON, CITY OF MADISON,

              Defendants.

## CITY OF MADISON, CARY HOUSE AND COLLEEN MICHELSON'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

      The City of Madison, Cary G. House and Colleen M. Michelson, by and through their attorneys, CRIVELLO CARLSON, S.C., respectfully submit the following Response Brief in Opposition to Plaintiff's Motion for Summary Judgment.

## <u>INTRODUCTION</u>

      Police officers are confronted with a volatile, inherently dangerous and potentially deadly situation each time they pull over a vehicle.  Courts are aware of this much and have repeatedly warned "that a significant percentage of murders of police officers occurs when the officers are making traffic stops." *Pennsylvania v. Mimms*, 436 U.S. 106, 110 (1977); *U.S. v. Robinson*, 414 U.S. 218, 234 (1972); *U.S. v. Lawuary*, 211 F.3d 372, 375 (7th Cir. 2000).  Courts have also recognized that the danger associated with traffic stops is exacerbated when a suspect "beg[ins] to get out of the car before the officers ha[ve] a chance to fully assess the situation." *U.S. v.*

*Pecina*, 2014 WL 3849847, No. 2:13-CR-00146, * 9 (N.D. Ind. Aug. 4, 2014).[1]  To mitigate the danger associated with traffic stops, police officers must "exercise unquestionable command of the situation."  *Arizona v. Johnson*, 555 U.S. 323, 324 (2009).

Both parties in this case have moved for summary judgment and have asked the Court to evaluate the conduct surrounding a March 16, 2011 traffic stop.  Plaintiff, Marvin Pullen, accurately points out in his Initial Brief that no genuine issues of material fact exist; however, he incorrectly concludes that he is entitled to judgment as a matter of law.

As for his **false arrest** claim, the following facts preclude summary judgment in Mr. Pullen's favor:

- Mr. Pullen exited his vehicle immediately after he pulled over.
- Mr. Pullen immediately started to approach Officer Michelson's squad car.
- Mr. Pullen disobeyed Officer Michelson's orders to get back into his vehicle.
- Mr. Pullen disobeyed Officer Michelson's orders to hang up his telephone.
- Mr. Pullen disobeyed Officer Michelson's orders to produce his identification.

As for the **excessive force** and **failure to intervene** claims, the following facts preclude summary judgment in Mr. Pullen's favor:

- Mr. Pullen was significantly larger than Officer House and Officer Michelson.
- The traffic stop was conducted to investigate potential felony child abuse.
- Mr. Pullen informed the officers that he knew why he was being pulled over.
- Mr. Pullen acted aggressively by immediately exiting his vehicle, by advancing towards Officer Michelson's squad car, and by refusing to allow Officer Michelson to adequately assess the situation.
- Mr. Pullen refused numerous police orders to get back inside of his vehicle, to hang up his phone, and to produce his identification.
- Mr. Pullen resisted Officer House and Officer Michelson's attempt to handcuff him by tensing up his arms, by moving his arms away, and by struggling with the officers.
- Mr. Pullen escalated his level of resistance after the knee-strike by releasing himself

---

[1] The court also indicated that "in 2012 (the most recent reported year) [traffic stops] resulted in eight felonious killings and 4,450 injuries to law enforcement officers."

from Officer House and Officer Michelson, by continuing to struggle with Officer Michelson, by refusing to allow Officer Michelson to handcuff him, and by refusing to voluntarily place his arms behind his back.

- Mr. Pullen escalated his level of resistance again after the first TASER deployment by refusing to voluntarily place his arms behind his back, by flailing his arms around, by yelling profanity, and by breaking TASER wires.

- Mr. Pullen escalated his level of resistance once more after the second TASER deployment by refusing to voluntarily place his arms behind his back, by flailing his arms around, by yelling profanity, by breaking TASER wires, by attempting to flee the scene, and by advancing towards Officer Michelson.

- Officer Michelson also did not have a realistic opportunity to intervene to prevent Officer House's use of force because of the rapidly evolving scenario and her respective position.

As for the official capacity claim, Mr. Pullen is not entitled to summary judgment because he introduce no evidence which demonstrates that the City of Madison, through its police department, was deliberately indifferent to police officer training, supervision or discipline on March 16, 2011.

## FACTS

All facts necessary to sustain Defendants' position are included in the City of Madison, Cary House and Colleen Michelson's Proposed Findings of Fact in Support of their Motion for Summary Judgment, Response to Plaintiff's Proposed Findings of Fact, and Supplemental Proposed Findings of Fact in Opposition to Plaintiff's Motion for Summary Judgment.

## ARGUMENT

## I.   PRELIMINARY MATTERS: FOURTEENTH AMENDMENT CLAIM AND ASSAULT AND BATTERY CLAIMS.

Mr. Pullen has waived his right to seek summary judgment on his Fourteenth Amendment and on his assault and battery claims because he failed to address those claims in his Initial Brief.  Summary judgment would nevertheless be improper for the following reasons:

As for the Fourteenth Amendment Claim, "all claims that law enforcement officers have

3

used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment. . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The "Fourteenth Amendment applies only to rights of a pretrial detainee." *Easley v. Kirmsee*, 235 F. Supp. 2d 945, 961 (E.D. Wis. 2002). In this case, Mr. Pullen was not seized until he was handcuffed. Because Officer House and Officer Michelson were **<u>attempting</u>** to seize Mr. Pullen at the time of the knee-strike and three TASER deployments, Mr. Pullen does not qualify as a pretrial detainee and therefore cannot seek relief under the Fourteenth Amendment.

Nor would summary judgment be warranted on the assault and battery claims. In *Schulze v. Kleeber*, 10 Wis. 2d 540, 545, 103 N.W.2d 560 (1960), the Wisconsin Supreme Court explained that an officer is "privileged to use whatever force [is] reasonably necessary to effect removal," and indicated that if an officer uses "more force than reasonably necessary, [such force constitutes] an assault and battery." *See also, Kalb v. Luce*, 228 Wis. 519, 279 N.W. 685 (1938). That "privilege" under Wisconsin law is synonymous with the federal *Graham v. Connor* "reasonableness" standard that governs federal excessive force claims. *See McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010) ("The dispositive question is whether . . . the officer behaved in an objectively reasonable manner.") For the reasons explained in this Brief, Mr. Pullen is not entitled to summary judgment on the federal excessive force claims and is therefore also not entitled to summary judgment on the state-law assault and battery claims.

## II.   MR. PULLEN IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE 42 U.S.C. § 1983 FALSE ARREST CLAIM.

The Court should deny summary judgment on the false arrest claim because Officer House and Officer Michelson had probable cause to arrest Mr. Pullen for resisting, and for aiding and abetting to felony child abuse.

4

To prevail on a 42 U.S.C. § 1983 claim of false arrest or false imprisonment against a police officer, "the plaintiff must show there was no probable cause for his arrest." *Jackson v. Parker*, 627 F.3d 634, 638 (7th Cir. 2010).  Probable cause "will preclude a false arrest claim, **even if the person was arrested on additional or different charges for which there was no probable cause.**" *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) (emphasis added).  Probable cause exists if **the totality of the facts and circumstances known to the officer at the time of the arrest** would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime.  *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012).

Probable cause deals "not with hard certainties but with probabilities." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013).  While probable cause necessitates more than a mere hunch, it "does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity – the officer's belief that the arrestee was committing a crime need only be **reasonable**." *Id.* (emphasis added).  Determining whether probable cause existed entails "a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant." *Id.*  Although the focus is on what the officer knew at the time of the arrest, courts "must determine whether those facts and circumstances, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.*  In doing so, courts must "be cognizant that police officers operate in the real world, often in rapidly unfolding and even chaotic circumstances." *Id.*  Finally, while the Fourth Amendment allows warrantless arrests for minor criminal offenses, the existence of probable cause depends on the elements of the predicate criminal offence as defined by state law.  *Id.*; *see Atwater v City of Lago Vista*, 532 U.S. 318 (2001).

Mr. Pullen claims that the seizure in this case was unlawful because the officers did not have probable cause to believe that he committed, was committing, or was about to commit a crime.  In doing so, he indicates that his refusal "to stop talking on his cell phone and to provide identification was the basis for the officers' grabbing his arms," and that such conduct "does not justify his arrest" under Wisconsin law.

Mr. Pullen's argument is unpersuasive because it fails to account for the totality of the facts and circumstances known to Officer House and Officer Michelson at the time of the arrest. Particularly, it completely glosses over the inherently dangerous nature of traffic stops and downplays the gravity of his own conduct during the encounter.

Under the totality of the facts and circumstances, Officer House and Officer Michelson had probable cause to arrest Mr. Pullen for violating Wis. Stat. § 946.41, which makes it a crime to "knowingly resist[] or obstruct[] an officer while such officer is doing any act in an official capacity and with lawful authority. . . ."  As an initial matter, Officer House and Officer Michelson were executing a volatile, inherently dangerous and potentially deadly maneuver – a traffic stop.  (Defendants' Response to Plaintiff's Proposed Facts, "Resp. PPF" 25.)  As such, they were required to "exercise unquestionable command of the situation" to ensure their own safety.  *See Pennsylvania v. Mimms*, 436 U.S. 106, 110 (1977); *U.S. v. Robinson*, 414 U.S. 218, 234 (1972); *Arizona v. Johnson*, 555 U.S. 323, 324 (2009); *U.S. v. Lawuary*, 211 F.3d 372, 375 (7th Cir. 2000).

Mr. Pullen's conduct during the traffic stop would warrant a reasonable, prudent person in believing that he had violated Wis. Stat. § 946.41.  Before the officers grabbed his arms, Mr. Pullen had already: exited his vehicle; started to advance towards Officer Michelson's squad car; and forced Officer Michelson to exit her squad car without having the opportunity to fully assess

6

the situation.  (Resp. PPF 27-30.)  Moreover, Mr. Pullen had repeatedly disregarded numerous commands from a police officer, including orders to: return back inside of his vehicle; hang up his cell phone; and produce his identification.  (Resp. PPF 19, 30, 32, 35, 41, 42.)  He also indicated that he knew why the officers had pulled him over.  *See Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (explaining that "it would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.").[2]

Under those facts and circumstances, any reasonable police officer would have believed that Mr. Pullen violated Wis. Stat. § 946.41.  Indeed, courts in other jurisdictions have held that similar conduct provides probable cause for arrest under their state's respective resisting and/or obstructing statute. *See e.g., Council v. State*, 662 S.E.2d 291 (Ga. Ct. App. 2008) (officers who performed traffic stop instructed defendant to remain in his vehicle, and defendant failed to comply with those orders); *People v. Krum*, 374 Mich. 356, 132 N.W.2d 69 (1965) (driver refused to show officer his driver's license, questioned and argued with officer, and placed himself between officer and his vehicle); *State v. Singletary*, 73 N.C. App. 612, 327 S.E.2d 11 (1985) (defendants ignored officer's order to stop advancing and continued to approach officer in a threatening manner toward the scene of an investigation/arrest).

Here, probable cause continued to exist under Wis. Stat. § 946.41 even after Officer House and Officer Michelson grabbed Mr. Pullen's arms to handcuff him.  At that point, Mr. Pullen increased his level of resistance by tensing his arms up and by attempting to move them away.  (Resp. PPF 44, 48, 50); (Defendants' Supplemental Proposed Facts, "Supp. PFOF" 8.)  He also began to struggle with the officers and, at one point, attempted to flee the scene.  (Resp. PPF 50-52. 55, 59, 67.)  Those circumstances are sufficient for a finding of probable cause.  *See*

_____

[2] Officer House and Officer Michelson later discovered that Mr. Pullen was driving without a valid license.

*e.g., Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 484 (7th Cir. 2011) (probable cause existed for resisting when plaintiff rebuffed officer's attempt to grasp him and began to backtrack); *State v. Leggions*, 263 Wis. 2d 432, 662 N.W.2d 679 (Ct. App. 2003) (probable cause existed for resisting when plaintiff tensed his arms and tucked them underneath his chest after officers attempted to secure them).

The officers also had probable cause to arrest Mr. Pullen for aiding and abetting to felony child abuse. Wis. Stat. § 948.03(2)(b) makes it a crime to "intentionally cause[] bodily harm to a child. . . ." An **omission** constitutes aiding and abetting if the defendant had a legal duty to act. *State v. Williquette*, 125 Wis. 2d 86, 90, 370 N.W.2d 282 (Ct. App. 1985). Because a parent has a legal duty to protect a child, *see Cole v. Sears Roebuck & Co.*, 47 Wis. 2d 629, 634, 177 N.W.2d 866 (1970), breach of that duty may give rise to criminal charges. *State v. Walden*, 306 N.C. 466, 293 S.E.2d 780 (1982).

Officer House and Officer Michelson had a limited amount of information when they attempted to detain Mr. Pullen. They knew that: a witness called 9-1-1 to report child abuse; the individual suspected of child abuse was an African American female; and the individual suspected of child abuse may be in Mr. Pullen's vehicle. (Supp. PFOF 1-4.) In light of this limited information, the facts and circumstances explained above provided probable cause to believe that Mr. Pullen was aiding and abetting to felony child abuse. Mr. Pullen exited his vehicle immediately after he pulled over. (Resp. PPF 27.) He then closed the door behind him, started moving away from his vehicle, and refused numerous orders to get back inside of his vehicle. (Resp. PPF 27, 29, 30, 32.) That conduct amplifies the level of danger to a responding police officer and is extremely rare during traffic stops. More importantly, it is consistent with the conduct of a suspect who is attempting to hinder an investigation by concealing the activities

or contents of his vehicle.  Indeed, Mr. Pullen's actions in this case forced Officer Michelson to exit her squad car immediately after she stopped for safety and tactical reasons which, in-turn, stripped her of the ability to fully assess the situation.  (Supp. PFOF 5, 6.)  Officer Michelson was unable to check Mr. Pullen's background, run his vehicle's license plate number, or obtain additional information regarding the investigation from the safety of her squad car.  Mr. Pullen's conduct also diverted Officer House and Officer Michelson's attention towards himself, and away from the occupants of his vehicle.  (Supp. PFOF 7.)

Mr. Pullen does not include the aforementioned details in his analysis and instead merely focuses on two facts: his "failure to comply with the officers' commands to stop talking on his cell phone" and his refusal to "provide identification."  His argument is unpersuasive because it fails to properly account for the totality of the facts and circumstances known to the officers at the time of the arrest.  When considering all of the facts and circumstances, any reasonable officer would conclude that probable cause existed for resisting and for aiding and abetting.  Mr. Pullen is therefore not entitled to summary judgment on his false arrest claim.

## III.   MR. PULLEN IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE EXCESSIVE FORCE CLAIMS.

### A.   Legal Standard Governing Excessive Force Claims.

Claims that officers used excessive force in seizing a person are evaluated under the Fourth Amendment's reasonableness standard.  *See Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2006).  "The dispositive question is whether, in light of the facts and circumstances that confronted the officer (and not with 20/20 hindsight), the officer behaved in an objectively reasonable manner."  *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 396-97 (1989).  The amount of permissible force depends upon the specific situation, including "the severity of the crime at issue, whether the suspect posed an immediate

threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. When officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them. *Id.*

The right to make an arrest inherently carries with it the right to use a certain amount of force. *Saucier v. Katz*, 533 U.S. 194, 208 (2001). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396-97. The calculation of reasonableness must embody allowance for the fact that officers are often forced to make split-second decisions – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. *Id.* Officers are not required to use the least amount of force possible or accommodate the specific preferences of an arrestee. *Brant v. Volkert*, 72 Fed. Appx. 463 (7th Cir. 2003). Rather, the standard is simply one of reasonableness under the circumstances presented to the officer at the time of the arrest. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997).

**B.     The Force Used against Mr. Pullen was Not *Per Se* Unreasonable.**

In his Initial Brief, Mr. Pullen claims that the officers' use of force was *per se* unreasonable because the underlying arrest was not supported by probable cause. As previously explained, that argument is unpersuasive because it focuses only on two facts, i.e., Mr. Pullen's refusal to hang up his phone and Mr. Pullen's refusal to produce his identification, rather than on the totality of the facts and circumstances known to the officers. (P's MSJ Brief, p. 19-20) ("Both officers believed that a refusal to get off the phone and refusal to produce identification are acts constituting the crime of resisting or obstructing arrest; these beliefs are a misstatement

of the law. . . .").

For the reasons detailed above, Officer House and Officer Michelson had probable cause to arrest Mr. Pullen for resisting and for aiding and abetting.  Reasonable force could be used to make the arrest.

**C.     The Knee-Strike was Reasonable.**

A knee-strike is considered minimal force and is justified when the totality of the circumstances lead an officer to reasonably believe that a suspect is resisting.  *See Smith v. Ball State Univ.*, 295 F.3d 763, 770-71 (7th Cir. 2002).

In his Initial Brief, Mr. Pullen claims that Officer House's knee-strike constituted excessive force because he "was not trying to harm ether officer in response to their grabbing his arm" and because the tension in his arms "could have been an automatic response."  (P's MSJ Brief, p. 20.)  That argument misses the mark.  Mr. Pullen's subjective belief is insignificant because the Fourth Amendment reasonableness standard must be evaluated strictly from the standpoint of an objectively reasonable **police officer**.  *Graham*, 490 U.S. at 396-97.  Mr. Pullen's subjective intent was unknown to the officers at the time.

Mr. Pullen also attempts to derive support for his argument by citing to *Clash v. Beatty*, 77 F.3d 1045 (7th Cir. 1996).  However, that case does not apply here because it involves the use of force on a suspect who **had already been handcuffed**, who **was not resisting**, and who was **simply being transported to a squad car**.  In this case, Mr. Pullen was not handcuffed when Officer House delivered the knee-strike.  Moreover, unlike the suspect in *Clash*, Mr. Pullen was resisting Officer House and Officer Michelson's attempt to handcuff him by tensing up his arms, by moving his arms away from the officers, and by continuing to argue with the officers.  (Resp. PPF 44, 48, 50.)  A knee-strike was a reasonable response to Mr. Pullen's resistance and was

necessary to regain "unquestionable command of the situation."

On the other hand, *Smith v. Ball State University* appropriately explains the circumstances under which a knee-strike may be used. 295 F.3d at 770-71. There, a police officer arrived at the scene and attempted to administer a knee-strike on a suspect who was unresponsive and in a diabetic shock. *Id.* Although the suspect was not resisting at the time, the Seventh Circuit court nevertheless held that the officer's knee-strike was constitutional because "a reasonable officer who appeared at the scene could reasonably misconstrue [the suspect's] unresponsiveness as resistance requiring the minimal use of force." *Id.*

The following circumstances existed at the time Officer House delivered the knee-strike:

- Mr. Pullen was significantly larger than Officer House and Officer Michelson. (Resp. PPF 103-05.)
- The initial traffic stop was related to a serious felony investigation (child abuse). (Resp. PPF 26.)
- Mr. Pullen informed the officers that he knew the traffic stop related to a serious felony investigation. (Resp. PPF 28.)
- Mr. Pullen acted aggressively by exiting his vehicle, by advancing towards Officer Michelson's squad car, and by refusing to allow Officer Michelson to adequately assess the situation. (Resp. PPF 27, 29, 30, 32.)
- Mr. Pullen had refused numerous orders to get back inside of his vehicle, to hang up his phone, and to produce his identification. (Resp. PPF 19, 30, 32, 35, 41, 42.)

More importantly, Mr. Pullen was resisting at the time Officer House administered the knee-strike. When the officers' attempted to handcuff Mr. Pullen, he tensed up his arms, moved his arms away from the officers, and continued arguing with the officers. (Resp. PPF 44, 48, 50-52.) Any reasonable officer would have concluded that a knee-strike was a reasonable response under the totality of the circumstances explained above. As such, Mr. Pullen is not entitled to summary judgment on his excessive force claim relating to the knee-strike.

**D.      The TASER Deployments were Reasonable.**

Mr. Pullen's analysis relating to the TASER deployments is flawed for the following reasons.  First, it discounts the significance of Mr. Pullen's own conduct.  Second, it fails to provide a complete depiction of the circumstances present.  Third, it introduces irrelevant facts and self-serving conclusions.

For example, in his Initial Brief, Mr. Pullen asserts that he was unarmed at the time, that he "did not attempt to harm either officers at the time," and that he did not present any danger to either officer.  (P's MSJ Br., p. 22.)  Those facts and self-serving conclusions are irrelevant to the analysis in this case because "the 'reasonableness' of a particular use of force must be judged from the **perspective of a reasonable officer on the scene**, **rather than with the 20/20 vision of hindsight.**"  *Graham*, 490 U.S. at 396.  The officers on the scene in this case – Officer House and Officer Michelson – did not know, and certainly should not have assumed, that Mr. Pullen: did not have a weapon, was not attempting to harm them, or would not have attempted to harm them if given the opportunity.

Mr. Pullen also attempts to muddy the waters by noting that one of the juveniles who was in his vehicle testified that "Officer House got up off the ground and looked very angry; shooting in anger rather than in conformity with the law. . . .  He was mad and upset so he tased him." (P's MSJ Br., p. 22.)  Mr. Pullen's reliance on a juvenile's understanding of civil rights law is misplaced.   The Fourth Amendment's "reasonableness" standard is a test of "objective reasonableness" which specifically precludes an inquiry into a police officer's subjective intent. *Graham*, 109 U.S. at 396-97.  Thus, whether an officer acted "maliciously or sadistically," or whether he "looked very angry," has no bearing on whether the use of force was reasonable. *Graham*, 109 U.S. at 396-97.  "An officer's evil intentions will not make a Fourth Amendment

violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force unconstitutional." *Id.*

Finally, Mr. Pullen improperly utilizes the benefit of 20/20 hindsight to cherry-pick and criticize certain decisions that were made during the inherently dangerous, unpredictable and rapidly-evolving traffic stop. Mr. Pullen indicates that Officer House did not provide him with a "verbal warning" prior to the TASER deployments. And, that he also failed to inform Officer Michelson of the same. It is difficult to understand how that decisions support a finding of excessive force, particularly when Mr. Pullen knew that a TASER was pointed in his direction and when he shouted "Tase me, Tase me." (Resp. PPF 57.) Mr. Pullen then notes that Officer House acted contrary to a bullet-point found in one of MPD's training PowerPoints when he pointed the TASER directly at his chest. That criticism has no bearing in this case because the violation of an administrative provision does not provide a basis for Fourth Amendment liability. *See Davis v. Scherer*, 468 U.S. 183, 194 (1984).

The totality of the facts and circumstances known at the time of the first, second and third TASER deployment are set forth below. A review of the same shows that the officers acted reasonably in deploying their TASER against Mr. Pullen.

### i.    The First TASER Deployment.

When police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them. *Graham*, 490 U.S. at 396. "As the threats change, so too should the degree of force." *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010). "Courts generally hold that the use of a Taser on an actively resisting suspect . . . is constitutionally reasonable." *Abbott*, 705 F.3d at 727. Moreover, they have explained that using a TASER is justified and "reasonably proportionate . . . to subdue

a suspect who [] repeatedly refuse[s] lawful orders of the police . . . where failing to use the Taser could have resulted in the escalation of violence." *U.S. v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011) (citing *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) (use of Taser deemed appropriate where motorist had exited his vehicle during traffic stop and had refused to comply with numerous police officer commands despite the fact that no physical contact was attempted with suspect prior to TASER use)).

In his Initial Brief, Mr. Pullen baldly asserts that he had only passively resisted when the TASER was initially used against him.  A review facts, however, demonstrates that the following circumstances were present, and were known to Officer House and Officer Michelson, at the time of the first deployment:

- Mr. Pullen was significantly larger than both officers.  (Resp. PPF 103-05.)
- The initial traffic stop was related to a serious felony investigation (child abuse). (Resp. PPF 26.)
- Mr. Pullen informed the officers that he knew the traffic stop related to a serious felony investigation.  (Resp. PPF 28.)
- Mr. Pullen acted aggressively by exiting his vehicle, by advancing towards Officer Michelson's squad car, and by refusing to allow Officer Michelson to adequately assess the situation.  (Resp. PPF 27, 29, 30, 32.)
- Mr. Pullen had refused numerous orders to get back inside of his vehicle, to hang up his phone, and to produce his identification.  (Resp. PPF 19, 30, 32, 35, 41, 42.)
- Mr. Pullen actively resisted the officers' attempt to handcuff him by tensing-up his arms.  (Resp. PPF 44, 48, 50.)
- Mr. Pullen actively resisted the officers' attempt to handcuff him by moving his arms away from the officers.  (Supp. PFOF 8.)
- Mr. Pullen actively resisted the officers' attempt to handcuff him by struggling with the officers.  (Resp. PPF 50-52. 55, 59, 67.)

Moreover, the officers were facing the following rapidly-evolving circumstances:

- Mr. Pullen had released himself from Officer House and Officer Michelson's hold. (Resp. PPF 54.)
- Mr. Pullen was struggling with Officer Michelson.  (Resp. PPF 54.)

15

- Officer Michelson was unable to handcuff Mr. Pullen during the struggle.  (Resp. PPF 55.)
- Mr. Pullen was yelling "Tase me Tase me" to Officer House.  (Resp. PPF 57.)
- Mr. Pullen was not voluntarily placing his hands behind his back.  (Supp. PFOF 12.)

Any reasonable officer would find it appropriate to deploy a TASER in light of the totality of the rapidly evolving and unpredictable circumstances enumerated above.  As such, Mr. Pullen is not entitled to summary judgment on his excessive force claim relating to the initial use of the TASER.

Finally, it is important to note that the initial TASER deployment resulted in minimal force because it did not produce a complete electrical circuit.  Indeed, Mr. Pullen testified in his deposition that he does not remember any electrical current going through his body.  (Resp. PPF 62.)

### ii.    The Second TASER Deployment.

The cycling of a TASER, or subsequent use of a TASER, has been deemed appropriate when a suspect continues to disregard police orders and continues – or escalates – his level of active resistance.  *See Clarett v. Roberts*, 657 F.3d 664, 647 (7th Cir. 2011) (affirming defense verdict where defendant used TASER three times on plaintiff; TASER was deployed second and third time because plaintiff was kicking and flailing and conducting assaultive behavior as defendant was arresting her).

As a preliminary matter, it is important to reiterate that the initial TASER deployment in this case was ineffective because it did not produce a complete electrical circuit.  Officer Michelson deployed her TASER just seconds after she realized the same.  By that point, Officer House and Officer Michelson were also facing the following rapidly-evolving circumstances in addition to those enumerated above:

16

- Mr. Pullen was still refusing to surrender.  (Supp. PFOF 12.)
- Mr. Pullen was still refusing to voluntarily place his arms behind his back despite his ability to move them.  (Supp. PFOF 12); (Resp. PPF 63.)
- Mr. Pullen was aggressively flailing his arms around in the air.  (Resp. PPF 63); (Supp. PFOF 13.)
- Mr. Pullen was aggressively yelling profanity.  (Supp. PFOF 13.)
- Mr. Pullen was breaking TASER wires.  (Resp. PPF 63.)

Any reasonable officer would find it appropriate to deploy a TASER in light of the totality of the circumstances enumerated above.  As such, Mr. Pullen is not entitled to summary judgment on his excessive force claim relating to the second use of the TASER.

Finally, it is important to note the second TASER deployment also resulted in minimal force because it also failed to produce a complete electrical circuit.  Mr. Pullen does not dispute the same.  (Resp. PPF 64.)

### iii.   The Third TASER Deployment.

Because the prior TASER deployments were all ineffective, Mr. Pullen did not voluntarily surrender or place his arms behind his back.  (Supp. PFOF 12.)  Instead, he continued to flail his arms around in the air, yell profanity, and break the TASER wires.  (Supp. PFOF 13.)  Mr. Pullen then started to flee the scene while Officer House and Officer Michelson gave chase.  (Resp. PPF 65, 67.)  At one point, Mr. Pullen turned towards Officer Michelson and started advancing in her direction.  (Resp. DPF 68, 71.)  Officer House was standing behind the two, believed that Officer Michelson was in imminent danger, and deployed his TASER at Mr. Pullen's back.  (Supp. PFOF 14-17.)

Officer House's use of force was objectively reasonable under the totality of the circumstances.  An application of the *Graham* factors demonstrates the same. *Graham*, 490 U.S. at 396 (the amount of permissible force depends on "the severity of the crime at issue, whether

the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight.")

As for the "threat to officer safety," Officer House and Officer Michelson were dealing with an inherently dangerous, unpredictable, and potentially deadly situation – a traffic stop. The officers could not mitigate the risk of harm associated with the stop because Mr. Pullen was not allowing them to exercise unquestionable command of the situation. As for the "severity of the crime at issue," Officer House and Officer Michelson were attempting to investigate an extremely serious matter, felony child abuse, which Mr. Pullen indicated he was aware of during the stop. As for the level of "active resistance," Mr. Pullen was refusing to voluntarily surrender, was refusing to place his arms behind his back, was continuing to violently flail his arms around in the air, and was continuing to yell profanity. As for "attempting to evade arrest," Mr. Pullen was fleeing the scene. Moreover, he placed Officer Michelson in imminent danger by turning towards her and by started to advance in her direction.

Officer House considered those *Graham* factors and the exigent circumstances present, prior to the third TASER deployment and determined – in a split-second – that such force was reasonable. Under the totality of the facts and circumstances present at the time, any reasonable officer would have concluded the same. As a result, Mr. Pullen is not entitled to summary judgment on his excessive force claim relating to the third TASER deployment.

Mr. Pullen attempts to derive support for the contrary from the Seventh Circuit case of *Cyrus v. Mukwonago*, 623 F.3d 853 (7th Cir. 2010). His reliance on that case is improper for the following reasons:

First, the suspect in *Cyrus* "had, at most, committed a misdemeanor offense," while Mr. Pullen was potentially involved in felony child abuse. Although Officer House and Officer

Michelson were aware that the individual suspected of child abuse was an African American female, they were nevertheless directed to Mr. Pullen's vehicle and had no information at the time regarding Mr. Pullen's involvement.  Mr. Pullen's own conduct, i.e., exiting the vehicle, closing the door, advancing towards Officer Michelson and refusing to get back into his vehicle, was also consistent with that of a suspect who is attempting to hinder an investigation by concealing the activities or contents of his vehicle.

Second, the circumstances in *Cyrus* did not transpire during the execution of a traffic stop.  Unlike Officer House and Officer Michelson, the officers in *Cyrus* were not required to exercise unquestionable command of the situation because they were not facing an inherently dangerous, volatile and potentially deadly encounter.

Finally, unlike the suspect in *Cyrus*, Mr. Pullen's level of resistance continued to escalate throughout the encounter.  The resistance started when Mr. Pullen refused the officers' lawful orders to get back inside of his vehicle, to hang up his phone, and to produce his identification. It increased when Officer House and Officer Michelson attempted to handcuff Mr. Pullen, as he tensed-up his arms and moved them away.  It continued to intensify after the knee-strike, as Mr. Pullen started to actively struggle with Officer Michelson and, at one point, was able to release himself from both officers.  Mr. Pullen's resistance escalated after the initial (ineffective) TASER deployment, as he violently flailed his arms around in the air, yelled profanity, and broke the TASER wires.  It then increased once more after the second (ineffective) TASER deployment, when Mr. Pullen continued to flail his arms around, continued to yell profanity, attempted to flee the scene and placed Officer Michelson in imminent danger.

At no point during the encounter did Mr. Pullen voluntarily agree to place his hands behind his back or to surrender.  Nor did his level of resistance ever decrease.

## IV.   MR. PULLEN IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE FAILURE TO INTERVENE CLAIM.

A failure to intervene claim can only be maintained if an officer was present at the scene, had reason to know that excessive force was being used, and had a realistic opportunity to intervene to prevent the harm from occurring. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 2004). An officer's failure to intervene must have been done "with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004). "Presence without more falls short of a deliberate or reckless disregard of [an individual's] constitutional rights." *Id.*

A realistic opportunity to intervene did not exist in this case because the knee-strike and TASER deployments all occurred within a very brief period of time.  Indeed, Mr. Pullen testified that the events relating to the use of force and arrest all happened very quickly.  (Supp. PFOF 18.)  He also expressly recognized in his Initial Brief that Officer Michelson was not given any type of verbal warning prior to the TASER deployments.  (P's MSJ Brief, p. 22) ("Officer House . . . did not communicate with Officer Michelson verbally . . . and instead shot his Taser at Mr. Pullen.").

In addition, Officer Michelson was unable to intervene because of the officers' respective positions.  When Officer House administered the knee-strike, Officer Michelson was attempting to handcuff Mr. Pullen and was still struggling to gain control.  (Supp. PFOF 11.)  She could not have anticipated or prevented Officer House from executing that maneuver.  As for the first TASER deployment, Officer Michelson did not have a realistic opportunity to intervene because she was not standing directly near Officer House at the time.  Moreover, she was still assessing and reacting to the fact that Officer House had fallen, and that Mr. Pullen had disengaged himself from her.  As for the third TASER deployment, Officer Michelson did not have a realistic

20

opportunity to intervene because she was unaware of Officer House's position, and because she did not know whether Officer House was also chasing Mr. Pullen. (Supp. PFOF 16-17.)

For those reasons, Mr. Pullen is not entitled to summary judgment on his failure to intervene claim.

## V.   OFFICER HOUSE AND OFFICER MICHELSON ARE ENTITLED TO QUALIFIED IMMUNITY.

### A.   Legal Standard Governing Qualified Immunity.

The Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage of litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Courts have explained that "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to allow for reasonable errors "because officials should not err always on the side of caution [for the] fear of being sued." *Humphrey v. Staszek*, 148 F.3d 719, 727 (7th Cir. 1998). The defense "erects a substantial barrier for plaintiffs, and appropriately so because qualified immunity is designed to shield from civil liability all but the plainly incompetent or those who knowingly violate the law." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994).

A two-part test exists to determine whether qualified immunity applies. First, a court must determine "whether the plaintiff's allegations, if true, establish a constitutional violation." *Rakovich v. Wade*, 850 U.S. 1180, 1209 (7th Cir. 1988). Second, if the plaintiff can show a constitutional deprivation, a court must then examine whether that constitutional right was "clearly established" at the time. *Id.* The plaintiff bears the burden of establishing both elements. *Id.*

"Clearly established law" at the time of the incident cannot be shown with "high levels of generality." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). Rather, it is shown by presenting "controlling authority" or "a robust consensus of cases of persuasive authority" as of the date of the incident in question. *Id.* at 2023; *see also Wood v. Moss*, 134 S.Ct. 2056, 2067 (2014) (deciding in part that a constitutional right not clearly established without previous case law); *Stanton v. Sims*, 134 S.Ct. 3, 5, 7 (2013) (reversing in favor of qualified immunity where prior case law "did not lay down a categorical rule for all cases" involving Fourth Amendment issue at stake, where Ninth Circuit read earlier precedent "too broadly," and where "[i]t is especially troubling that the Ninth Circuit would conclude that Stanton was plainly incompetent – and subject to personal liability for damages - based on actions that were lawful according to courts in the jurisdiction where he acted."); *Reichle*, 132 S.Ct. at 2093-94 (rejecting "clearly established" argument where Supreme Court had "never recognized" similar arguments before).

### B.    Qualified Immunity Precludes the False Arrest Claim.

For the reasons explained above, a constitutional deprivation cannot be established in this case because Officer House and Officer Michelson had probable cause to arrest Mr. Pullen for resisting and for aiding and abetting in felony child abuse. This alone warrants a finding of qualified immunity. *See Schlessinger v. Salimes*, 100 F.3d 519, 523 (7th Cir. 1996) (a court need not examine whether a right was clearly established when a plaintiff cannot show that he or she suffered a constitutional deprivation).

Qualified immunity is also proper in this case because Officer House and Officer Michelson had "arguable probable cause" to arrest Mr. Pullen. Courts have explained that "the probable-cause standard inherently allows room for reasonable mistakes, but qualified immunity affords an added layer of protection by shielding officers from "suit for damages if 'a reasonable

22

officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Abbott*, 705 F.3d at 715. Often termed "arguable probable cause," qualified immunity in this context protects officers who "reasonably but mistakenly believe that probable cause exists." *Id.* "Though at first blush similar, the arguable-probable-cause inquiry is separate from the probable-cause inquiry; whereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable probable cause is a violation of a "clearly established" constitutional right." *Id.*

In this case, arguable probable cause for arrest existed under Wis. Stat. § 946.41 because Mr. Pullen immediately exited his vehicle after he was pulled over, started to aggressively advance towards Officer Michelson's squad car, and refused numerous police orders to get back inside of his vehicle, get off his phone and produce his identification. Mr. Pullen's conduct during the traffic stop was extremely rare and consistent with that of an individual who is attempting to obstruct a police investigation or conceal the contents or occupants of his vehicle. Under the totality of the circumstances, Officer House and Officer Michelson also had arguable probable cause to arrest Mr. Pullen for aiding and abetting in felony child abuse.

## C. Qualified Immunity Precludes the Excessive Force and Failure to Intervene Claims.

Officer House and Officer Michelson are entitled to qualified immunity because there was no underlying constitutional deprivation. The use of force was an appropriate response to Mr. Pullen conduct. He was resisting, flailing his arms around, disregarding lawful orders, yelling profanities, breaking TASER wires, fleeing the scene, and placing police officers in imminent danger.

Qualified immunity is also warranted because Mr. Pullen cannot demonstrate – with the requisite level of specificity – a clearly established right at the time of the alleged deprivation.

The Seventh Circuit recently provided a summary of what "clearly established" law currently exists in this jurisdiction in relation to the use of a TASER:

> In 2009, we found that it had been clearly established in 2006 that a TASER could not be used against a prone, weakened, and docile prisoner who had been told to rise one time, had not been warned that failure to comply would result in use of a TASER, and had been zapped before having a chance to comply with the order to rise. If it was clearly unlawful in 2006 to use a TASER on a moving prisoner who had been ordered to rise, then it surely was clearly unlawful a year later to use a TASER on a noncompliant, nonmoving misdemeanor arrestee who had already been immobilized by an initial TASER jolt. And more recently, we held that it was clearly established in 2005 that officers could not repeatedly use an impact weapon to beat into submission a person who was not resisting or was merely passively resisting officers' orders. Additionally, since 2007, many of our sister circuits have found the use of a TASER against nonviolent, nonresisting misdemeanants to violate clearly established law, the absence of TASER case law notwithstanding.

*Abbot*, 705 F.3d at 733. (internal citations omitted).

Mr. Pullen cannot show that a Fourth Amendment right was clearly established in cases where a suspect escalated his level of resistance throughout the entire encounter, flailed his arms around, disregarded officers' orders, yelled profanities, broke TASER wires, fled the scene, and placed an officer in imminent danger. All of which transpired during an inherently dangerous and unpredictable traffic stop. Nor can he cite to "a robust consensus of cases of persuasive authority" which have recognized the same.

Finally, while qualified immunity may be denied where the conduct at issue is clearly unreasonable, that is certainly not the case here. Officer House and Officer Michelson were forced to make split-second decisions in a circumstance that the Supreme Court has indicated is uncertain, rapidly evolving, inherently dangerous and often deadly. The officers appropriately graduated their use of force to meet the demands of the circumstances confronting them, while at the same time keeping in mind their need to exercise "unquestionable command of the situation." *See Johnson*, 555 U.S. at 324.

24

## VI.   MR. PULLEN IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE *MONELL* CLAIM.

### A.   Summary Judgment is Not Warranted Because Mr. Pullen Did not Suffer a Constitutional Deprivation.

A 42 U.S.C. § 1983 claim against a municipality can only be maintained if a plaintiff first establishes that he actually suffered a constitutional injury. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994). "If a person has suffered no constitutional injury at the hands of [an] individual police officer, the fact that the departmental regulations might have authorized [unconstitutional conduct] is quite beside the point." *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). This principle is well-known and oft-cited. *Tom v. Voida*, 963 F.2d 952, 962 (7th Cir. 1992) ("because [the officer] did not violate [the plaintiff's] constitutional rights, there is no basis for liability" against the municipality); *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 465 (7th Cir. 2007) ("Because we have determined that all of plaintiff's claims under federal law were properly dismissed, there can be no § 1983 liability for Boone County either."); *Thompson*, 33 F.3d at 859 (if individual officers did not violate plaintiff's constitutional rights, the municipality cannot be held liable under a *Monell* claim); *Abraham v. Piechowski*, 13 F. Supp. 2d 870, 880 (E.D. Wis. 1998) ("Assum[ing] (with some skepticism) that a constitutional violation occurred" in order to proceed with a *Monell* analysis).

An exception to the aforementioned rule exists in limited circumstances which are not present in the case at hand. Specifically, where a plaintiff establishes a constitutional violation, but is precluded from recovery solely on the basis of qualified immunity. *See Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 306 (7th Cir. 2009) (*Monell* claim was not barred because a constitutional violation was established and individual defendants were dismissed solely because of qualified immunity).

For the reasons explained in this Brief and in Defendants' Motion for Summary Judgment Brief, Mr. Pullen's constitutional rights were not violated by these individual Defendants.  As such, he is not entitled to summary judgment on his *Monell* claim.

**B.     Summary Judgment is Not Warranted under a Failure-To-Train Theory.**

Mr. Pullen argues that the City of Madison, through its police department, should be held liable for failing to properly train its police department on the use of force.  For the reasons explained below, summary judgment is not warranted.

The United States Supreme Court has repeatedly emphasized that failure-to-train can give rise to municipal liability only under "limited circumstances."  *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).  In fact, "[a] municipality's culpability for a deprivation of rights **is at most tenuous where a claim turns on failure to train.**"  *Id.*  (emphasis added).  The alleged failure-to-train must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

The deliberate indifference standard is "a stringent standard of fault," which "require[es] proof that a municipal actor disregarded a known or obvious consequence of his action."  Bd. Of *Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997) (emphasis added).  To show deliberate indifference in the failure-to-train context, a plaintiff must prove that policymakers: (1) had actual or constructive notice that a particular defect in training existed and caused employees to violate citizens' constitutional rights; and (2) disregarded such notice and retained the defective training program.  *Id.*  "A less stringent standard of fault for a failure-to-train claims 'would result in de facto respondeat superior liability on municipalities. . . ."  *Connick*, 131 S.Ct. at 1359.

The Supreme Court applied those stringent standards in upholding dismissal of a failure-

to-train claim in *City of Canton v. Harris*.  There, officers arrested plaintiff and transported her to the police station.  *Id.* at 378.  While at the station, plaintiff twice slumped to the floor and was eventually left there in order to prevent her from falling again.  *Id.* at 381-83.  When officers asked plaintiff if she needed medical attention, she responded with an incoherent remark.  *Id.* Medical assistance was therefore not procured.  *Id.*  Shortly after being released, plaintiff was transported to a hospital by a family-procured ambulance and was later diagnosed with "suffering from emotional aliments."  *Id.* at 381.  Years later, plaintiff sued the city for violating her constitutional right to receive necessary medical attention while in custody.  *Id.* at 381-83. The case proceeded to trial and the jury found the City liable because officers were not provided with special training to determine when to summon care for an injured detainee.  *Id.*  The lower court held there had been no error in submitting the failure-to-train claim to the jury and indicated that a municipality may be liable for failing to train officers where a plaintiff proves that the municipality acted recklessly, intentionally, or with gross negligence.  *Id.*

The Supreme Court reversed and emphasized the "limited circumstances" under which a municipality may be liable.  *Id.* at 388.  It explained that "inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id.* at 388-89. The Court first noted that a stringent standard is consistent with Supreme Court precedent:

> This rule is most consistent with our admonition in *Monell* . . . that a municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'  Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.

*Id.* at 389.  It then explained how the deliberate indifference standard must be applied in failure-to-train cases:

Monell's rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. [Rather], the issue . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.' It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 389-90 (emphasis added). In evaluating a failure-to-train claim, the focus must be on the

adequacy of the training program **not on an individual officer's acts**:

**[The fact that a] particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program**. . . . It may be, for example, than an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the mere fact that they do says little about the training program or the legal basis for holding the city liable.

*Id.* at 390-91. The Court summed-up its analysis with the following word of caution:

To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident. Thus, permitting cases against cities for their 'failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities – a result we rejected in *Monell*. . . . It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

*Id.* at 391-92.

The evidence presented in Mr. Pullen's Initial Brief falls considerably short of meeting the threshold for obtaining summary judgment under a failure-to-train theory. In-fact, Mr. Pullen's Brief proves that his *Monell* claim is meritless. Mr. Pullen has introduced no evidence to show that MPD was deliberately indifferent to use of force or arrest training. That is, facts to demonstrate that: the Department had actual or constructive notice of a particular defect in its training program; any such defect actually caused officers to violate citizens' constitutional rights; and the Department disregarded any such notice and retained a defective training program.

Despite the requirement that a failure-to-train theory must focus on the adequacy of the **training program itself,** rather than on **an individual officer's acts**, Mr. Pullen nonetheless limits his analysis to the two officers named in this lawsuit. Specifically, he notes that:

- "The City's deliberate indifference is demonstrated by the fact that neither Officer Michelson nor House could recite a prior training . . . that discussed the appropriateness in the use of force." (P's MSJ Br., p. 30.)
- "The fact that neither officer could say anything more than a generalized, rudimentary statement about the use of force [during their deposition] speaks volumes as to the inadequacy of their training in the use of force." (P's MSJ Br., p. 30.)
- "Officer House admitted that after he graduated from the academy, he never participated in the five week ride along with a more seasoned officer." (P's MSJ Br., p. 31.)

Mr. Pullen has missed the mark. That one or two officers in a large police force may be unable to recite verbatim a departmental policy regarding the use of force during a tedious discovery deposition certainly does not "speak volumes" regarding the adequacy of that department's training program. On the contrary, it has no bearing on the same. Nor does the fact that Officer House, a single MPD officer, did not participate in a select aspect of a broad departmental training program. A brief review of the Supreme Court precedent cited above demonstrates this much. *Harris*, 489 U.S. at 390-91 (indicating that a failure-to-train claim must

focus on the adequacy of the training program itself, not on an individual officer's acts, and explaining that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city. . . .").

Mr. Pullen also argues that Officer House and Officer Michelson have an incorrect understanding of the words "exigent circumstances," "stumbling," and "suspect," as provided in MPD's written policies: "Pullen was never a suspect; stumbling can hardly be characterized as fleeing; and there were no exigent circumstances given he was unarmed." (P's MSJ Br., 31-32.) It is difficult to understand how that argument is relevant to the issue at hand. Aside from the general inaccuracy of his assertion, the fact that Mr. Pullen has a different, and self-serving, opinion regarding the meaning of MPD's written policies has no bearing on, and certainly does not demonstrate, that the Department was deliberately indifferent to its training needs.

While the focus of this inquiry should not be on an individual officer, it is worth noting that Officer House and Officer Michelson's records reveal a considerable amount of training prior to March 16, 2011. Aside from the more than 520 hours of training that he received during pre-service academy, and the regular on-the-job training he continuously received from MPD, Officer House's records indicate that he also received the following formal training from 2008 to the date of this incident:

| DATE | COURSE TITLE | HOURS |
|---|---|---|
| 5/18/2008 | Firearms Qualification | 1 |
| 10/22/2008 | NHTSA DWI Detection | 40 |
| 10//23/2008 | Class I PBT Permit | n/a |
| 11/3/2008 | Taser Certification Test | n/a |
| 1/6/2009 | Firearms Qualification | 1 |
| 1/15/2009 | Firearms Qualification | 1 |
| 1/25/2009 | In-Service Training | 8 |

| 4/3/2009 | Handgun/Rifle, Simulation Scenario, Missing Persons, Suicide | 8 |
| 6/1/2009 | Less Lethal Impact Projectile User Certification & Shotgun Training | 12 |
| 9/30/2009 | Handgun, TASER Exercise, Facebook, Professionalism, Harassment | 8 |
| 11/3/2009 | EVOC Policy Review, Practical, IBR & Use of Force Reporting | 8 |
| 2/1/2010 | PBT Certification | n/a |
| 3/30/2010 | Rifle, Policy, Classroom Training, Handgun Qualification | 8 |
| 6/27/2010 | Brazilian Jiu Jitsu For Law Enforcement | 3 |
| 10/11/2010 | Rifle/Less Lethal, Handgun, Blocking, Core Exercises, Airsoft | 8 |
| 10/21/2010 | Technology, Gang Update, Officer Safety, Hazardous Materials, WMD Patrol Response and Case Studies | 8 |
| 1/14/2011 | In Service Training | 8 |

(Supp. PFOF 19, 20.)

Aside from the more than 520 hours of training that she received during pre-service academy and the regular on-the-job training she continuously received, Officer Michelson's records indicate that she completed the following formal training courses from 2007 to the date of this incident:

| DATE | COURSE TITLE | HOURS |
|---|---|---|
| 1/11/2007 | Firearms Qualification | 1 |
| 2/21/2007 | TASER Certification Training | 8 |
| 3/14/2007 | Handgun Training, MILO/IES, EVOC, VET Affairs Presentation | 8 |
| 6/5/2007 | Firearms Qualification | 1 |
| 9/19/2007 | Rifle & Handgun Training, DAAT, Scenario | 8 |
| 1/17/2008 | Firearms Qualification | 1 |
| 2/15/2008 | Unfulfilled Expectations & Trust, Internal Communications, Disparate Impact & Police Operations, Emergency Preparedness | 8 |
| 4/9/2008 | Court Detectives/DA Report & Update, Elder Abuse, MG&E – Electric Safety MFD Update – Agitated Delirium & Back Draft | 8 |
| 5/18/2008 | Firearms Qualification | 1 |
| 5/19/2008 | Sex, Drugs and Rock N Roll Addiction, Compulsion and Craving | n/a |
| 5/20/2008 | Firearms Qualification | 1 |
| 6/2/2008 | Mental Illness & Substance Disorders | n/a |

31

| 6/3/2008 | Nobody Gets Hurt: Assessing and Managing Risk | n/a |
| 9/25/2008 | Crisis Intervention Conference | n/a |
| 10/6/2008 | Handgun, AR-15 | 8 |
| 10/7/2008 | Hazardous Materials, Mental Health | 8 |
| 1/6/2009 | Firearms Qualification | 1 |
| 3/4/2009 | In Service Training | 8 |
| 4/28/2009 | Handgun, Rifle, Simulation Scenario, Missing Person | 8 |
| 10/7/2009 | EVOC Policy Review and Update, Practical, IBR, Use of Force | 8 |
| 10/8/2009 | Handgun, TASER, Facebook Overview, Professionalism, Harassment | 8 |
| 3/22/2010 | Promotional Academy | 40 |
| 3/31/2010 | Rifle Training, Policy, Classroom Training | 8 |
| 9/9/2010 | Rifle/Less Lethal, Handgun Qualification, Blocking, Core Exercises | 8 |
| 9/10/2010 | Technology, Gang Update, Safety, Hazardous Materials, WMD Patrol | 8 |
| 1/14/2011 | In Service Training | 8 |

(Ds' Supp. PFOF 21.)

The record in this case does not show that MPD was deliberately indifferent to the training needs of its police officers regarding the use of force or arrests. Consequently, Mr. Pullen is not entitled to summary judgment on his *Monell* claim under a failure-to-train theory.

## C.   Summary Judgment is Not Warranted under a Failure-To-Supervise or Failure-To-Discipline Theory.

In limited circumstances, a municipality's failure to supervise or discipline can give rise to liability under § 1983 because a policy of condoning abuse may embolden a municipal employee and facilitate further abusive acts.  *Sigle v. City of Chicago*, 2013 WL 1787579 (N.D. Ill. Apr. 25, 2013).  However, the mere fact that a policymaker failed to supervise or discipline is insufficient for establishing municipal liability.  *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998).  A plaintiff must show that the governmental body caused the deprivation and must satisfy the deliberate indifference standard adopted in *Canton*.  *See Abraham*, 12 F. Supp. 2d at

881; *Sigle*, 2013 WL 1787579, *2.

The deliberate indifference standard is "a high threshold," and "[e]ven where significant evidence has been presented indicating flawed investigatory, [disciplinary or supervisory] procedures courts still reject [such a theory] where plaintiffs cannot demonstrate 'tacit authorization by city policymakers.'" *Id.* Courts have explained that:

> A custom of failing to discipline, [investigate or supervise] police officers can be shown to be deliberately indifferent if the need for further discipline, [investigation or supervision] **is so obvious and [established] procedures so inadequate as to be likely to result in the violation of constitutional rights** such that a jury could attribute to the policymakers a deliberate indifference to the need to discipline, [investigate or supervise].

*Id.*, *3 (emphasis added).

Evidence of statistics and complainants registering allegations alone are insufficient to support a *Monell* claim. *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985) (dismissing *Monell* claim where the record was devoid of any evidence other than statistical summaries of complaints filed with the police department and stating that the number of complaints alone "does not indicate that the policies that [plaintiff] alleges do in fact exist and did contribute to his injury."); *Bryant v. Whalen*, 759 F. Supp. 410, 412 (N.D. Ill. 1991) (granting summary judgment for City because "the fact that a low percentage of cases are ultimately sustained cannot in and of itself be read to establish a policy of indifference.").

MPD adequately supervised and disciplined its police officers on the date of the incident. The Department had established practices and written policies in place relating to the investigation of citizen complaints. Citizens could file a formal complaint against a police officer at the Chief's office, at the nearest district location, or directly on the MPD website. (Supp. PFOF 22.) All complaints were reviewed and entered into MPD's computer system. (Supp. PFOF 23.)

Serious complaints against police officers were forwarded to MPD's Professional Standards and Internal Affairs division. (Supp. PFOF 24.) A PS & IA official would then: review the complaint; review all applicable police reports; review any 9-1-1 records and squad video footage; interview the complainant; interview other potential witnesses; and conduct a formal interview with the police officer involved. (Supp. PFOF 25.) If a policy violation was discovered, the PS & IA official would file a predetermination notice, at which point the police officer involved had seven days to respond and explain the policy violation. (Supp. PFOF 26) The PS & IA official was then required to forward his findings, along with the entire file, to the Chief of Police, who made the ultimate disciplinary decision. (Supp. PFOF 27.)

Minor citizen complaints, i.e., rudeness, lateness, and traffic violations, were generally handled by local districts, where a lieutenant would initially review the complaint and decide if additional investigation was needed. (Supp. PFOF 28.) If the lieutenant determined that further inquiry was required, he or she would review the applicable MPD written reports, speak with the complainant, review any 9-1-1 calls and squad car videos, and potentially interview the officer involved depending on whether significant discrepancies in the parties' reports/complaints existed. (Supp. PFOF 29.) The lieutenant would then then administer the appropriate discipline. (Supp. PFOF 30.)

At no point did Mr. Pullen file a citizen complaint with MPD regarding the events that transpired on March 16, 2011; however, he now alleges that "the City has [] shown deliberate indifference by its failure to adopt appropriate procedures to deal responsibly with complaints of police brutality." (P's MSJ Br., p. 32.)

Again, Mr. Pullen does not focus his analysis on MPD's policies, procedures or acts, and does not explain how the Department was deliberately indifferent to obvious disciplinary or

supervisory needs.  He instead points out a few instances (without providing details) where MPD officials did not personally interview Officer House and Officer Michelson in regard to a citizen complaint filed against them.  As explained above, MPD officers are not always interviewed when citizen complaints are filed against them.  The fact that Officer House and Officer Michelson were not questioned does not suggest that the complaints were never reviewed or investigated, and certainly does not prove, as a matter of law, a deficiency in MPD's supervision or disciplinary practices.

In a last-ditch effort, Mr. Pullen attempts to drum-up a *Monell* claim by discussing Officer House's criminal conduct.  That attempt fails for numerous reasons.  First, those events occurred after March 16, 2011 and are therefore irrelevant to the case at hand.  Second, those events do not involve excessive use of force or false arrest.  Third, those events occurred outside of the scope of employment and did not involve a citizen complaint against an on-duty police officer.  Fourth, those events were formally investigated and the appropriate disciplinary action was taken.

The record in this case in no way shows that MPD was deliberately indifferent with regard to how it supervised or disciplined police officers.  Consequently, Mr. Pullen is not entitled to summary judgment on his *Monell* claim under a failure-to-supervise or failure-to-discipline theory.

## **CONCLUSION**

For all of the reasons explained above, Defendants respectfully ask this Court to deny Mr. Pullen's Motion for Summary Judgment in its entirety.

Dated this 22nd day of December, 2014.

By: /s/ Samuel C. Hall, Jr.
     SAMUEL C. HALL, JR.
     State Bar No. 1045476
     MATTEO REGINATO
     State Bar No. 1089724
     Attorneys for Defendants, Cary G. House,
     Colleen M. Michelson and City of Madison
     CRIVELLO CARLSON, S.C.
     710 N. Plankinton Avenue, Ste 500
     Milwaukee, WI  53203
     Ph: (414) 271-7722
     Fax: (414) 271-4438
     E-mail:   shall@crivellocarlson.com
              mreginato@crivellocarlson.com