UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

MARVIN PULLEN,

      Plaintiff,

GROUP HEALTH COOPERATIVE OF      Case No. 13-CV-00827
SOUTH CENTRAL WISCONSIN,

v.

GARY G. HOUSE AND COLLEEN M.
MICHELSON, CITY OF MADISON,

      Defendants.
_____

### PLAINTIFF'S RESPONSE TO DEFENDANTS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT
_____

The plaintiff, Marvin Pullen, by and through his attorneys, Davey & Goldman, by Lisa M. Goldman, respectfully submits the following Response to Defendants' Supplemental Proposed Findings of Fact.

1. Officer Michelson was sitting inside of a MPD squad car parked at the West District Police Station when she heard a call from dispatch. (Hall Aff., Exh. B, October 27, 2014 Deposition of Officer Michelson, "Michelson Depo.," p. 44:18-22; Exh. H.)

**Response:** **Disputed to the extent that the call came from dispatch. On pages 74-75 of Michelson's deposition she admits she spoke with Officer Goehring about the call before stopping Pullen's car.**

2. The call from dispatch that Officer Michelson heard was regardig a "dark green car with Wisconsin plate 500PGG." (Hall Aff., Exh. B, Michelson Depo., Exh. H.)

1

**Response:** Undisputed, but incomplete. See Response to Supplemental Proposed Findings of Fact No. 4.

3. Officer Michelson heard from dispatch that a witness had "called 911 and stated that a woman was beating a child inside of this vehicle and the vehicle was last seen headed south" in an area near the West District Police Station. (Hall Aff., Exh. B, Michelson Depo., pp. 39-40; Exh. H.)

**Response:** **Disputed in part and incomplete. Nothing on pages 39 or 40 mentions a 911 call. Officer Goehreng radioed dispatch and provided the license plate number and asked that the car be found and said that the woman was not in the car. (See Response to Supplemental Proposed Findings of Fact No. 4). Officer Goehring also agreed that at the time he radioed dispatch he did not consider it to be a felony. (Goehring Dep. p. 65:17-19.)**

4. Officer Michelson also heard from dispatch that "a female black suspect may be in that vehicle with the victim children." (Hall Aff., Exh. B, Michelson Depo., p. 62:19-24; Exh. H.)

**Response:** **Disputed. Page 62 of Michelson's deposition does not say Michelson heard from dispatch that a female suspect was in the car. Officer Goehring was walking outside to check on what he thought was a potential child abuse situation involving Mitchell and the girls outside. On his way outside, he encountered a white woman, Tamira Johnson, who reported that a black female was "whaling" on a kid in the car. (Goehring Dep. 49:22-51:15). Johnson provided Officer Goehring the license plate information for the vehicle. (Goehring Dep. 52:1-13). Johnson also reported to Officer Goehring that the car left without Mitchell inside. (Goehring Dep. 54:3-7). Officer Goehring radioed dispatch, requesting backup to find the car regarding a possible investigation of physical**

2

abuse to a child. At that time, Officer Goehring knew that the teens left with Pullen, not Mitchell. Based on this fact, Goehring testified that he likely would have reported to dispatch the fact that Mitchell – the suspect of the potential abuse – was not in the car. (Goehring Dep. 54:8-55:8, 56:14-57-9, 58:6-14.) The objective of the request to stop Pullen's vehicle was to check on the welfare of the children inside the car. (Goehring Dep. 65:15-19).

5. When Officer Michelson pulled Mr. Pullen's vehicle over, Mr. Pullen immediately exited his vehicle and started advancing towards Officer Michelson's squad car. (Hall Aff., Exh. B, Michelson Depo., pp. 57:24-58:3; 64:21-24; Exh. H.)

Response: Disputed in part. Pullen pulled over and got out of his vehicle and took a couple of steps toward the rear of his car and stopped next to his car when Office Michelson instructed him to do so, and was talking on his phone. (See Response to DPFF 38; Mea Pullen Dep., pp. 28-29.)

6. Officer Michelson was required to immediately exit her squad car for safety and tactical reasons after Mr. Pullen pulled over. She had no time "to make any radio transactions" other than perhaps to inform dispatch that she was executing a traffic stop. (Hall Aff., Exh. B, Michelson Depo., pp. 40:12-23; 76:4-14; Exh. H.)

Response: Disputed in part. Pullen stopped along side his car and Michelson advised dispatch before she told him to get behind the car. (See Response to DPFF No. 46.) Further, once Pullen did stop by his car Michelson had time to make radio transactions. Moreover, she testified that she and Pullen exited their cars at the same time – an indication of no urgency. (Michelson Dep., p. 42:11-13.)

3

7.      Mr. Pullen's conduct during the traffic stop diverted Officer House and Officer Michelson's attention away from the occupants who were sitting in the back seat of his vehicle at the time.  (Hall Aff., Exh. B, Michelson Depo., pp. 62:25-63:6; Exh. H.)

**Response:     Pullen did not interfere with Michelson's ability to observe the individuals in the vehicle who she should have been able to see through the back window of the car.  Michelson refused to answer Pullen's request to explain and did not ask him any questions about who was in the car or tell him to step out of the road so she could talk to the individuals in the car.  Michelson radioed dispatch before she asked him to step behind the car.  When Michelson asked Pullen to step behind the car, he did so.  (See Plaintiffs Resps. to DPFF No. 38 & 47.)**

8.      When Officer House and Officer Michelson attempted to grab Mr. Pullen's arms and arrest him during the traffic stop, Mr. Pullen tensed up his arms up and moved them away from the officers.  (Hall Aff., Exh. B, Michelson Depo., p. 84:2-11; Exh. H.)

**Response:     Undisputed, but incomplete.  House and Michelson grabbed Pullen's arms within 10-20 seconds of House's arrival.  (See Plaintiff's Resps. to DPFF No. 53.)**

9.      Because of Mr. Pullen's active resistance and attempt to flee, Officer House and Officer Michelson were unable to handcuff Mr. Pullen during the traffic stop until after the third TASER deployment.  (Hall Aff., Exh. C, Movember 19, 2014 Deposition of Marvin Pullen, "Pullen Depo.," p. 91:9, 96:16-18.)

**Response:     Disputed.  These citations show Pullen's arms tensed and he did not voluntarily produce his arms.  The citations say nothing else.  He also was not asked to produce his arms.  This is a self-serving conclusion, not a fact and a conclusion not supported by the evidence.  Pullen did not actively resist or attempt to flee.  House and**

4

**Michelson grabbed Pullen's arms within 10-20 seconds of his arrival.  A few seconds after grabbing Pullen, House delivered knee strike to Pullen's stomach and House fell down.  House got up and immediately Tasered Pullen while he was backing away with his arms in the air in surrender mode.  Michelson then immediately Tasered Pullen in the chest and as Pullen stumbled sideways getting closer to the ground House Tased him in the back causing him to fall face first to the ground. .  (See Plaintiff's Resp. to DPFF Nos. 57-81.)**

10. After Officer House and Officer Michelson attempted to handcuff Mr. Pullen during the traffic stop, they instructed Mr. Pullen several times to stop resisting and to place his arms behind his back.  (Hall Aff., Exh. B, Michelson Depo.., Exh. 14.)

**Response:    Disputed.  Officer House did not order Pullen to do anything or say anything to him until after he was handcuffed.  Michelson did not order him to put his hands behind his back or stop resisting Michelson (See Plaintiff's Resps. to DPFF Nos. 49,52,58,66 and 69.) (Michelson Dep. Pp. 82-85, 92-93.)**

11. Officer Michelson was attempting to handcuff Mr. Pullen and was struggling with Mr. Pullen when Officer House administered the knee-strike.  (Hall Aff., Exh. B, Michelson Depo., p. 84:3-14; Exh. H.)

**Response:    Disputed.  The knee strike happened within 10-15 seconds ("a few seconds") after they grabbed his arms.  (See Plaintiff's Resps to DPFF Nos. 56-60.)**

12. Mr. Pullen engaged in a physical struggle with Officer House and Officer Michelson after they attempted to handcuff him.  Mr. Pullen refused to voluntarily place his arms behind his back or to voluntarily surrender prior to the third TASER deployment.  (Hall Aff., Exh. B, Michelson Depo., Exh. H.)

**Response:    Disputed.  (See Plaintiff's Responses to DPFF Nos. 53-60.)**

5

13. Mr. Pullen aggressively flailed his arms around in the air, yelled profanities, and broke the TASER wires after the first and second TASER deployment. (Hall Aff., Exh. C, Pullen Depo., pp. 104-105.)

**Response:** **Disputed. Officer Michelson described Pullen's reactions as typical of how a person reacts when the Taser is not completely effective. Pullen said "what the fuck" but did not yell profanities at the officers. (See Plaintiff's Responses to DPFF Nos. 67-80; Michelson Dep. pp. 92-96; Pullen Supp. Decl. ¶3)**

14. Officer House's written report indicates as follows:

> I then saw Pullen running across the road and I followed as I put a new cartridge in my [TASER]. Pullen came up to a snow bank and started to turn towards P.O. Michelson. At that time I fired my [TASER] at Pullen's back which was effective.

(Hall Aff., Exh. D, November 12, 2014 Deposition of Officer House, "House Depo.," Exh. 2.)

**Response:** **This proposed finding of fact is identical to defendants' proposed finding of fact No. 77. (See Plaintiff's Response to DPFF No. 77.)**

15. Officer House then deployed his TASER at Mr. Pullen's back before Mr. Pullen reached Officer Michelson. (Hall Aff., Exh. D, House Depo., p. 81:15-25); (Hall Aff., Exh. B, Michelson Depo., p. 97:18-23.)

**Response:** **Disputed. This proposed finding of fact is identical to DPFF No. 78. (See Plaintiff's Response to DPFF No. 78.)**

16. Officer Michelson could not see Officer House at the time of the third TASER deployment. (Hall Aff., Exh. B, Michelson Depo., p. 97:18-23.)

**Response:** **Disputed. This proposed finding of fact is identical to DPFF No. 79. (See Plaintiff's Response to DPFF No. 79.)**

6

17.     Officer Michelson did not know Officer House's position at the time of the third TASER deployment.  (Hall Aff., Exh. B, Michelson Depo., p. 97:18-23.)

**Response:     Disputed.  (See Response to No. 16 above.)**

18.     The events relating to the use of force and arrest all transpired very quickly.  (Hall Aff., Exh. C, Pullen Depo., p. 97:12-13.)

**Response:     Undisputed, but incomplete.  The officers caused the events to transpire very quickly.  House and Michelson grabbed Pullen's arms without warning 10 to 20 seconds after House arrived on the scene; House administered a knee strike to Pullen's abdomen within "a few seconds" of grabbing Pullen's arms and he fell down; House got up and without uttering a word to Pullen, Tasered him in the chest while his arms were in the air; Michelson promptly Tasered Pullen in the chest; and while Pullen was stumbling sideways and backwards in the street getting closer to the ground, House Tasered Pullen again, causing him to fall face forward to the ground.  (See Plaintiff's Responses to DPFF Nos. 51-80.)  Pullen was never given a chance to voluntarily be handcuffed.  (Id.)**

19.     Officer House received over 520 hours of training during pre-service academy. (Hall Aff., Exh. D, House Depo., Exh. 9.)

**Response:     Undisputed.**

20.     Officer House completed numerous formal MPD training courses prior to the date of the incident.  (Hall Aff., Exh. D, House Depo., Exh. 9.)

**Response:     Undisputed.**

21.     Officer Micelson received over 520 hours of training during pre-service academy and completed numerous formal MPD training courses prior to the date of the incident.  (Hall Aff., Exh. B, Michelson Depo., Exh. J.)

**Response:   Disputed in part.  Exhibit J does not show Michelson completed 520 hours of training during pre-service academy.**

22.   MPD had established policies and practices in place relating to the investigation of citizen complaints prior to, and on March 16, 2011.  Citizens could file a formal complaint against a police officer at the Chief's office, at the nearest district location, or directly on the MPD website.  (Hall Aff., Exh. E, December 5, 2014 Deposition of Cory Nelson, "Nelson Depo.," p. 15:14-25.)

**Response:   Disputed in part.  Undisputed that a complaint can be filed.  Disputed that MPD has written formal policies for investigating a citizen complaint and that the policies testified to are insufficient because an investigation will not occur for a complaint older than 60 days or with criminal charges pending.  Nelson Dep., pp. 30-32.**

23.   All complaints were reviewed and entered into MPD's computer system.  (Hall Aff., Exh. E, Nelson Depo., p. 13:19-22.)

**Response:   Disputed.  Nelson testified that this typically is done when a sergeant take the complaint.  No evidence exists that this is universally done.  (Nelson Dep., p. 13-14.)**

24.   Serious complaints against police officers were forwarded to MPD's Professional Standards and Internal Affairs division.  (Hall Aff., Exh. E, Nelson Depo., p. 10:16-20.)

**Response:   Disputed.  Nelson's testimony was not definitive as to routine treatment for every complaint.  (Nelson Dep. pp. 9-10.)**

25.   A PS & IA official would then:  review the complaint; review all applicable police reports; review any 9-1-1 records and squad video footage; interview the complainant;

8

interview other potential witnesses; and conduct a formal interview with the police officer involved. (Hall Aff., Exh. E, Nelson Depo., pp. 58-59.)

**Response:    Disputed.  This is what Nelson says should happen but conceded it does not happen all the time – as in House and Michelson's cases.  (Nelson Dep., pp. 108-109.)**

26.    If a policy violation was discovered, the PS & IA official would file a predetermination notice, at which point the police officer involved had seven days to respond and explain the policy violation. (Id.)

**Response:    Undisputed.**

27.    The PS & IA official was then required to forward his findings, along with the entire file, to the Chief of Police, who made the ultimate disciplinary decision. (Hall Aff., Exh. E, Nelson Depo., p. 59:5-19.)

**Response:    Undisputed.**

28.    Minor citizen complaints, i,e., rudeness, lateness, and traffic violations, were generally handled by local districts, where a lieutenant would initially review the complaint and decide if additional investigation was needed. (Hall Aff., Exh. E, Nelson Depo., pp. 10:16-20; 50:21-25.)

**Response:    Disputed.  Nelson did not specify that rudeness, lateness, and traffic violations were minor citizen complaints in the citation above.  He did not specify the division between minor and major and it is not a written policy for each type of complaint.**

29.    If the lieutenant determined that further inquiry was required, he or she would review the applicable MPD written reports, speak with the complainant, review any 9-1-1 calls and squad car videos, and potentially interview the officer involved depending on whether

9

significant discrepancies in the parties' reports/complaints existed. (Hall Aff., Exh. E, Nelson Depo., pp. 51:14-19; 60:11-17.)

**Response:** **Disputed in part. Nelson testified that "Minor complaints don't need predetermination hearing notices. They don't need formal interviews. And they don't need predetermination hearing finding notices."**

30. The lieutenant would then then administer the appropriate discipline. (Hall Aff., Exh. E, Nelson Depo., p. 60:11-23.)

**Response:** **Disputed in part. Discipline on minor complaints can be issued by a number of different supervisors. (Nelson Depo. 60:11-12.)**

Dated: January 20, 2015

        DAVEY & GOLDMAN
        Attorneys for Plaintiff
        Marvin Pullen

        /s/ Lisa C. Goldman
        Bruce M. Davey SBN: 1012256
        Lisa C. Goldman, SBN: 1029893
        7609 Elmwood Ave., Suite 203
        Middleton, WI 53562
        Phone (608) 833-2603
        Fax (608) 205-5645
        lgoldman@daveygoldman.com