IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARVIN PULLEN and
GROUP HEALTH COOPERATIVE OF
SOUTH CENTRAL WISCONSIN,

     Plaintiffs,[1]

  v.

CARY G. HOUSE, COLLEEN M. MICHELSON
and CITY OF MADISON,

     Defendants.

OPINION AND ORDER

13-cv-827-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

On March 16, 2011, defendant Colleen M. Michelson, an officer for the Madison

Police Department, pulled over plaintiff Marvin Pullen to investigate possible child abuse

by the mother of plaintiff's daughter.  Plaintiff was not suspected of any wrongdoing and the

---

[1]  Plaintiff Group Health Cooperative of South Central Wisconsin is named in the complaint as an "involuntary plaintiff" because "it may have paid medical expenses on behalf of Plaintiff Marvin Pullen and may have a right to subrogation to the extent of such payments."  Am. Cpt. ¶ 12, dkt. #13.  However, in federal court, a party who wishes to name an involuntary plaintiff must show that the absent party has refused to be joined as a plaintiff and is outside the court's jurisdiction.  7 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 1606, at 73 (3d ed. 2001); Murray v. Mississippi Farm Bureau Casualty Insurance Co., 251 F.R.D. 361, 364 (W.D. Wis. 2008).  Because there is no suggestion that Group Health objects to joining the lawsuit or that it is outside this court's jurisdiction and Group Health's interests appear to be aligned with Pullen's for the purpose of Pullen's claims against defendants, I have designated Group Health simply as a plaintiff.  However, because Group Health did not participate in the motions discussed in this opinion, I will refer to Pullen as "plaintiff."

1

mother was not in the car, which would suggest that the stop would be brief and uneventful. Instead, the stop became contentious and physical.  After plaintiff failed to comply with some of Michelson's orders, Michelson and defendant Cary House (another Madison police officer, who arrived on the scene shortly after plaintiff was stopped) subjected plaintiff to a "knee strike" and three taser strikes and then handcuffed and arrested him for resisting an officer in violation of Wis. Stat. § 946.41.  (Neither side explains what a "knee strike" is, but I assume that the officer used his knee to hit plaintiff.)  Plaintiff was taken to the hospital in an ambulance for injuries he sustained when the third taser strike caused him to fall on his face.  The charge for resisting was later dismissed.

In this civil lawsuit brought under 42 U.S.C. § 1983 and state law, plaintiff contends that his injuries were the result of a false arrest and use of excessive force by defendants.  In addition, he contends that the City of Madison may be held liable for failing to train, supervise and discipline its officers adequately.

Defendants have moved for summary judgment on all of plaintiff's claims. Dkt. #23. With respect to plaintiff's federal claims against the officers, defendants argue that they had probable cause to arrest plaintiff for both resisting an officer and aiding and abetting child abuse and that no reasonable jury could find that defendants used excessive force.  In the alternative, defendants argue that clearly established law does not show that they violated plaintiff's constitutional rights, so they are entitled to qualified immunity.  Defendants argue that plaintiff's state law claims are governed by the same standard as federal law and should be dismissed as well.  Finally, defendants argue that city cannot be held liable under § 1983

because plaintiff has not adduced evidence of a policy that caused any constitutional violation that may have occurred.

Plaintiff has filed a cross motion for summary judgment on his federal claims.  Dkt. #27.  He argues that, under the undisputed facts, clearly established law establishes that defendants subjected him to a false arrest and excessive force.  In addition, he argues that the city may be held liable as a matter of law.

I am granting plaintiff's motion for summary judgment with respect to the issue whether defendants had probable cause to arrest plaintiff for aiding and abetting child abuse. I am granting defendants' motion for summary judgment with respect to plaintiff's claim against the city and with respect to plaintiff's claim that defendant Michelson failed to intervene to stop defendant House from delivering a knee strike to plaintiff and from deploying the third taser strike.  However, for the reasons discussed below, I conclude that genuine issues of material fact preclude granting either side's motion for summary judgment with respect to the remaining issues.

OPINION

A.  Police Reports

On many occasions in their proposed findings of fact, defendants rely on their police reports to prove the truth of a particular fact without citing any affidavit or deposition testimony to back up the report.  Because plaintiff objects to the police reports as hearsay, an important threshold question is whether defendants' police reports are admissible in the

context of the parties' motions for summary judgment.

Neither side cites binding authority supporting their view. Defendants cite <u>Woods</u> <u>v. City of Chicago</u>, 234 F.3d 979 (7th Cir. 2000), for the proposition that "[p]roperly authenticated police reports are admissible as business records" under Fed. R. Evid. 803(6), but <u>Woods</u> does not include that holding.  Rather, the court held that the statements in the police reports were not hearsay because the defendants were not relying on them for the truth of the matter.  <u>Id.</u> at 986-87.

Plaintiff cites <u>Palmer v. Hoffman</u>, 318 U.S. 109, 113 (1943), and <u>United States v.</u> <u>Blackburn</u>, 992 F.2d 666, 670 (7th Cir. 1993), for the general proposition that records "made in anticipation of litigation" cannot qualify as business records under Rule 803(6), but in neither of those cases did the court hold that police reports should be treated as records made in anticipation of litigation.  In fact, neither case involved police reports at all.

Defendants also cite three district court cases, but the court in each of those cases simply stated that police reports could qualify as business records under some circumstances. <u>Bloodworth v. Village of Greendale</u>, 2011 WL 98835, at *5 (E.D. Wis. 2011); <u>Latosky v.</u> <u>Strunc</u>, 2009 WL 1073680, at *4 (E.D. Wis. 2009); <u>Hottenroth v. Village of Slinger</u>, 2003 WL 24153923, at *5 n.8 (E.D. Wis. 2003).  None of these cases include any reasoning or a discussion of the circumstances in which it would be appropriate to treat police reports as a business record.  (Some of these cases discuss treating police reports as "public records" under Fed. R. Evid. 803(8), but defendants do not argue that the police reports qualify under the public records exception to the hearsay rule, so I do not consider that question.)

The key question that is not addressed by the parties or the cases they cite is whether police reports may be considered sufficiently reliable to qualify as business records when they were prepared by the party being sued, a party who would have had an incentive to prepare the report in a self-serving manner, regardless whether the party was anticipating a lawsuit at the time.  Fed. R. Evid. 803(6)(E) (record does not qualify for hearsay exception if "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness").

In my own research, I uncovered United States v. Ware, 247 F.2d 698, 700 (7th Cir. 1957), which seems to support plaintiff's position.  Relying on Palmer, 318 U.S. 109, the court held that reports by prepared by federal narcotics agents in the context of an arrest were inadmissible hearsay:

> [E]ven if memoranda such as the ones in question are regularly prepared by law enforcement officers, they lack the necessary earmarks of reliability and trustworthiness. Their source and the nature and manner of their compilation unavoidably dictate that they are inadmissible under [the hearsay exception for business records]. They are also subject to the objection that such utility as they possess relates primarily to prosecution of suspected law breakers, and only incidentally to the systematic conduct of the police business.

In Bracey v. Herringa, 466 F.2d 702, 705 (7th Cir. 1972), the court of appeals relied on Ware in the context of a § 1983 lawsuit to hold that "it was error for the district court to accept in support of the defendants' motion for summary judgment prison records which included the self-serving statements of the defendants themselves as well as statements of other prison guards who were subject to possible Civil Rights Act liability. This kind of record lacks reliability and trustworthiness."  In a footnote, the court stated in dicta that

"[p]olice reports are ordinarily excluded when offered by the party at whose instance they were made." Id. at n.9.

The holdings, dicta and reasoning of these cases are strong support for a conclusion that defendants' police reports are not admissible in this case as business records under Fed. R. Evid. 803(6).  Although both Ware and Bracey are older cases, I did not uncover any cases within the circuit undermining their continuing viability.  As  recently as 2013, the court of appeals has cited Bracey with approval.  Jordan v. Binns, 712 F.3d 1123, 1135 (7th Cir. 2013) (holding that insurance adjuster's report created after accident should have been excluded as hearsay).

However, there is an additional wrinkle that the parties do not address.  In Jajeh v. County of Cook, 678 F.3d 560, 567-68 (7th Cir. 2012), the court of appeals raised the question whether recent changes to Fed. R. Civ. P. 56 have eliminated the requirement that, in the context of a motion for summary judgment, statements must be sworn to be admissible:

> In 2010, Rule 56 was reorganized and altered. "Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1). Other provisions are relocated or omitted." Fed. R. Civ. P. 56, advisory committee's note (2010 amends.). Rule 56(c)(4) no longer requires a formal affidavit to be submitted, but instead allows a declaration to be used to oppose a motion for summary judgment, so long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated."

The court did not decide whether the unsworn statement was admissible because the court decided the appeal on other grounds.  Id.

Jajeh was about unsworn declarations, but in Olson v. Morgan, 750 F.3d 708, 714

(7th Cir. 2014), the court expanded the question to "whether anything more than an unsworn statement is needed to oppose summary judgment." The court then cited Fed. R. Civ. P. 56(c)(2)-(4) for the proposition that "the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form." Again, however, the court decided the appeal on other grounds.

Defendants' police reports are unsworn statements. Although the reports may be inadmissible at trial because they are hearsay, presumably defendants could rely on the reports to refresh their recollection of the relevant events. Fed. R. Evid. 803(5) (witness may use document to refresh recollection if proponent testifies that she can no longer recall matter addressed in record, she made record around time of relevant event and record is accurate). Thus, I cannot say that the facts in the police reports could not "later be presented in an admissible form." Accordingly, I will consider defendants' proposed findings of fact that rely on their police reports, but I will treat them as disputed to the extent that the report differs from the account that defendants gave in their deposition testimony. Thomas v. Cook County Sheriff's Dept., 604 F.3d 293, 302 (7th Cir. 2010) ("When faced with conflicting, or even inconsistent testimony, the jury is free to believe one side over another."); Gil v. Reed, 535 F.3d 551, 557 (7th Cir. 2008) (inconsistent testimony from same witness creates fact issue for jury to resolve).

B. Traffic Stop

7

The next question is whether the stop was lawful.  Plaintiff does not seek summary judgment on this issue and he is silent on the question whether he means to raise a separate claim challenging the stop separately from the arrest.  Defendants treat the stop as a separate claim in their opening brief and then, for reasons they do not explain, they do an about face in their reply brief, arguing that "the Court should not analyze the legality of the stop" because plaintiff did not identify it as a separate claim in his complaint.  Dkt. #63 at 5.  However, defendants acknowledge that plaintiff included allegations challenging the stop in his complaint, which is all he was required to do; "[p]laintiffs need only plead facts, not legal theories, in their complaints."  Reeves ex rel. Reeves v. Jewel Food Stores, Inc., 759 F.3d 698, 701 (7th Cir. 2014).  In any event, because the validity of the stop affects the validity of defendants' subsequent actions, it is necessary to address the stop regardless whether it is a separate claim.

1.  Background

The events that led to plaintiff's stop and arrest began at the West Towne Mall in Madison, Wisconsin on March 16, 2011.  Plaintiff's daughter and granddaughter (both teenagers at the time) were detained by Madison police officer Jerry Goehring after they were accused of shoplifting.  Both plaintiff and Nina Mitchell, the mother of plaintiff's daughter, went to the mall, but they drove in separate cars and arrived at different times, with Mitchell arriving first.  Although plaintiff was cooperative and calm, Mitchell was visibly upset with the girls and yelled at them.

8

After Goehring issued citations to the girls for theft, he released them to plaintiff and Mitchell.  Goehring heard Mitchell yelling in the parking lot, so he walked out to speak to her again, encouraging her to calm down and warning her that it was not appropriate to hit a child.  During that conversation, plaintiff and the girls got into plaintiff's car.

Goehring walked back inside and began watching the parking lot through video surveillance.  He saw what he interpreted to be Mitchell "throwing overhand punches into the car," though he could not determine whether she was actually hitting anyone.  Goehring Dep., dkt. #48, at 48, 50.

Goehring returned to the parking lot to check on the girls again, but plaintiff, Mitchell and the girls were gone.  A woman approached Goehring and said that she had seen what appeared to be a black female (both Mitchell and plaintiff are African Americans) who was "whaling on a kid in the car."  Id. at 50.  (Plaintiff objects to this testimony as inadmissible, but he does not explain his objection, Plt.'s Resp. to Dfts.' PFOF ¶ 21, dkt. #56, and he included the same statement in his own proposed findings of fact.  Plt.'s PFOF ¶ 18, dkt. #54.  The testimony is not hearsay because defendants are not relying on the woman's statement for the truth of the matter, but for the effect it had on Goehring.  Jewett v. Anders, 521 F.3d 818, 827 (7th Cir. 2008).)

At some point, Goehring called dispatch and asked that plaintiff's car be pulled over "to conduct a child abuse investigation and a welfare check on the young girls."  Dfts.' PFOF ¶ 25, dkt. #56.  Defendant Michelson responded to the call, spotted plaintiff's car and pulled him over.

9

2.  Analysis

Both sides cite Terry v. Ohio, 392 U.S. 1 (1968), and its progeny for the relevant standard:  "the legitimacy of a Terry stop depends upon an officer's ability to produce articulable facts giving rise to a reasonable suspicion that a [suspect] has been, is, or is about to be engaged in criminal activity."  Smith v. Ball State University, 295 F.3d 763, 768 (7th Cir. 2002).   Defendants argue that Michelson had reasonable suspicion because she had received information from dispatch that Mitchell may have hit the girls and that Mitchell was with the girls in plaintiff's car.  Plaintiff argues that Michelson had no authority to stop the car because she knew that Mitchell was *not* in the car and she had no reason to suspect plaintiff of any wrongdoing.

It is undisputed that Michelson had no reason to suspect plaintiff of child abuse or any other crime when she pulled him over. Michelson Dep., dkt. #43 at 62.  Although it is also undisputed that Mitchell was not in the car when defendant Michelson stopped plaintiff,  Plt.'s Supp. PFOF ¶ 1, dkt. #64, Michelson denies that she knew this when she stopped plaintiff.  This is important because reasonable suspicion "is not determined by retrospect.  It depends on what the police know, or reasonably believe, at the time." Bridewell v. Eberle, 730 F.3d 672 (7th Cir. 2013).  Thus, the relevant question is whether Michelson reasonably believed at the time of the stop that Mitchell was not in plaintiff's car. (The parties do not say how Mitchell left the mall, but presumably she left with the friend who drove her there.  Plt.'s PFOF ¶ 7, dkt. #54.)

10

As an initial matter, plaintiff argues that anything Goehring knew may be imputed to defendant Michelson under the collective knowledge doctrine.  He cites <u>United States v. Williams</u>, 627 F.3d 247, 252-53 (7th Cir. 2010), in which the court stated: "The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action. . . .  In order for the collective knowledge doctrine to apply, (1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible  for the officer requesting it."  <u>Williams</u> was a criminal case in which the government relied on the doctrine to justify an arrest.  Plaintiff does not cite any authority for the proposition that the doctrine may apply in a civil case under § 1983 in which the plaintiff is attempting to use the doctrine to hold an officer personally liable for something she did not know.  However, defendants do not object to plaintiff's reliance on the collective knowledge doctrine, so I decline to consider whether it should apply.  In any event, even if the collective knowledge doctrine does not apply, I conclude that plaintiff has raised a genuine issue of material fact on the question whether Michelson knew that Mitchell was not in plaintiff's car.

During their depositions, neither Goerhing nor Michelson had clear memories regarding the information that Goerhing provided to dispatch and that Michelson heard

11

from dispatch.  Unfortunately, there are no recordings available of those communications. Plt.'s PFOF ¶ 113, dkt. #54. (Plaintiff does not argue that the city disposed of any recordings after it had notice of plaintiff's claim, so I do not consider whether spoliation has occurred.)  Instead, defendants rely primarily on the police reports that Goehring and Michelson prepared.  In his report, Goehring stated that he did not see whether Mitchell left with plaintiff and that he told dispatch simply to "stop [plaintiff's car] for investigation of a possible physical abuse of a child."  Dfts.' PFOF ¶ 26, dkt. #56.  In her report, Michelson wrote that she heard from dispatch that "a woman was beating a child inside of [the] vehicle" and that "a female black suspect may be in that vehicle."  Dfts.' PFOF ¶¶ 29-30, dkt. #56.

In support of a contrary version of events, plaintiff cites Goehring's own deposition testimony, in which Goehring admitted that he knew plaintiff and Mitchell arrived at the mall separately, Goehring Dep. at 56, dkt. #48, and that he "believed" that the witness in the mall parking lot told him that Mitchell did *not* get into plaintiff's car when he left the mall with the girls.  Id. at 54.  In addition, plaintiff says that Goehring admitted that he would have given dispatch the important information that he had, id. at 57, which, had he known it, would have included whether Mitchell was in the car.  Finally, he cites Michelson's deposition testimony, in which she stated that she "most likely" heard Goehring send his call to dispatch because she was listening to the calls in her squad car at the time.  Michelson Dep., dkt. #40, at 31.  Putting all this together, plaintiff argues that a reasonable jury could find that both Goehring and Michelson knew that Mitchell was not in the car when she

12

stopped it.

Defendants say that Goehring contacted dispatch *before* he spoke to the witness, so he could not have communicated the information about Mitchell not being in the car. However, this contradicts defendants' own proposed finding of fact on this issue. Dfts.' PFOF ¶ 25, dkt. #56 ("Based on the events he witnessed, his review of the video footage, *and the information provided by the witness*, Officer Goehring called out Mr. Pullen's vehicle plate to dispatch so that MPD officers could pull Mr. Pullen's vehicle over to conduct a child abuse investigation and a welfare check of the young girls.") (emphasis added). Further, Goehring testified in his deposition that he called dispatch *after* he spoke to the witness. Goehring Dep., dkt. #48, at 53 ("Q: What did you do after you took [the witness's] information? A: I called out the vehicle plate and I said I needed to try to stop the car."). It is undisputed that Goehring spoke to the witness only once. Id. at 53.

It is true that elsewhere in his deposition Goehring testified that he did not "know . . . the sequence of events" and that he "did not know when [he] called out the vehicle plate" and when he learned that Mitchell went "to the other car." Id. at 56. However, this simply confirms the existence of a genuine dispute. In the context of a motion for summary judgment, I must consider all of the evidence; I cannot look at only those portions of Goehring's deposition that supports defendants' litigation positions.

Plaintiff's theory may be a bit of a stretch, but I cannot say that it is so implausible that no reasonable jury could agree with his view. It is well-established that, on a motion for summary judgment, "[t]he court may not weigh the evidence or decide which testimony is

13

more credible. Even if one side's story is more believable, the court must avoid the temptation to decide which party's version of the facts is more likely true." McCann v. Iroquois Memorial Hospital, 622 F.3d 745, 752 (7th Cir. 2010) (citations, alterations and internal quotations omitted).   See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-255 (1986) (summary judgment is unwarranted "[i]f reasonable minds could differ as to the import of the evidence").   Accordingly, I conclude that it is genuinely disputed whether defendant Michelson believed that Mitchell was in plaintiff's car when Michelson stopped plaintiff.  Because defendants do not argue that Michelson had reasonable suspicion to believe when she stopped plaintiff that *he* had committed any crimes and because the reasonable suspicion standard is well established under Terry and many other cases, e.g., United States v. Cortez, 449 U.S. 411, 417–18 (1981); United States v. Baskin, 401 F.3d 788, 791 (7th Cir. 2005), Michelson is not entitled to qualified immunity on the lawfulness of the stop for the purpose of summary judgment.  Wood v. Moss, 134 S. Ct. 2056, 2066-67 (2014) (defendants not entitled to qualified immunity if "the right was clearly established at the time of the challenged conduct").

In their reply brief, defendants argue for the first time that the stop was lawful even if Michelson knew that Mitchell was not in the car because Michelson had a duty under Wis. Stat. § 48.981(2r)(b) to investigate the report of child abuse, even if plaintiff was not a suspect.  However, defendants cite no authority for the view that Michelson's state law duty may override the Fourth Amendment requirement of reasonable suspicion under the circumstances of this case.  As noted above, both sides cite the Terry standard as governing

14

the stop, which requires reasonable suspicion that the individual stopped had committed a crime.

It is true that "the Supreme Court has recognized limited situations at the scene of police activity in which it may be reasonable for police to detain people not suspected of criminal activity themselves," United States v. Howard, 729 F.3d 655, 659-61 (7th Cir. 2013), but defendants do not address the case law discussing those situations, much less develop an argument regarding why that case law supports their view. In any event, defendants forfeited this argument for the purpose of summary judgment by failing to raise the issue in their opening brief. Narducci v. Moore, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.").

## C.  Arrest and Use of Force

### 1.  Background

It is not always clear in the parties' proposed findings of fact what the exact sequence of events was after defendant Michelson stopped plaintiff's car. However, for the purpose of providing background to the reader, I have attempted to summarize the relevant facts below, in roughly chronological order.

Plaintiff stopped his car on the side of the road and defendant Michelson pulled up behind him. She could see two individuals in the back seat of the car. (Michelson says she could not tell whether the individuals were children or adults and she could not determine

15

whether anyone was in the front seat.)  While talking on his cell phone, plaintiff exited his car and closed the door.  (Plaintiff does not explain why he did this.)  Michelson exited her car as well.  Plaintiff asked Michelson why she was pulling him over and stated that he wanted to explain the situation. Michelson did not answer plaintiff's questions or give him an opportunity to explain, but instead yelled at him, ordering him to get back into his car and to get off the phone.  (Michelson says that plaintiff was yelling at her as well and asked why he needed to get back into his car.)  Plaintiff did not comply with either of Michelson's orders (which Michelson says she gave several times), but instead repeated his attempts to talk to Michelson. (Plaintiff says that he complied with the order to get off the phone at some point, but he does not say when.  Pullen Dep., dkt. #44, at 84.)

Defendant Michelson radioed dispatch, informed them that plaintiff was not cooperating with her orders and asked for backup. Defendant Cary House, another Madison police officer, responded almost immediately to defendant Michelson's request for backup.

At some point, plaintiff took a couple of steps in defendant Michelson's direction. (Michelson says that plaintiff "began to aggressively approach" her, Dfts.' Resp. to Plt.'s PFOF ¶ 29, dkt. #54, but she does not explain what was "aggressive" about plaintiff's behavior, so I have not considered that statement.  Neither side identifies how far apart plaintiff and Michelson were, but plaintiff's daughter testified in her deposition that they were "not close." M.P. Dep., dkt. #37, at 27.)  Michelson asked plaintiff to step to the rear of his vehicle and he complied.  By then, both Michelson and House were present.  Plaintiff did not comply immediately with a demand to produce identification.

16

Without speaking or giving plaintiff any warning, defendant House grabbed plaintiff's right arm and defendant Michelson grabbed plaintiff's left arm.  (In his proposed findings of fact, plaintiff says that he was reaching for his identification when defendants grabbed his arms, but the deposition testimony he cites does not support that statement.  Rather, he testified only that defendants did not give him sufficient time to produce his identification. Pullen Dep., dkt. #33, at 87, 152-53).  Plaintiff tensed up his arms and tried to pull them away.  (In one of his briefs, plaintiff says that it is disputed whether he tried to pull his arms away, dkt. #65 at 12, but he does not cite any evidence to support that view.  Further, in his response to defendants' proposed findings of fact, he did not dispute defendants' assertion that he tried to move his arms away.  Plt.'s Resp. to Dfts.' Supp. PFOF ¶ 8, dkt. #66.)

Plaintiff said, "Why are you arresting me?  You have no reason to arrest me."  In response, defendants told plaintiff to put his arms behind his back.  Defendants say that plaintiff refused multiple orders to stop resisting and put his arms behind his back.

Defendant House "delivered a knee strike" to plaintiff's midsection on his right side. House Dep., dkt. #34, at 80. (Plaintiff says this was only a few seconds after defendants grabbed him.)  House then lost his balance and fell to the ground.  (Defendants do not allege that House fell because plaintiff pushed him or that plaintiff otherwise caused House to fall.)

According to plaintiff, at this point he pulled away to avoid falling on defendant House and stepped back into the middle of the street with his arms up in the air "in a surrender mode" while stating "all I need to do is explain to you what is going on."  Pullen

Dep., dkt. #33, at 87-88.  According to defendant Michelson, plaintiff simply stood over defendant House.  Michelson Dep., dkt. #35, at 85-86.  Michelson pulled plaintiff away from where defendant House had fallen and grabbed plaintiff's hands in an attempt to place them behind his back. Michelson says that plaintiff continued to struggle with her.

As defendant House stood up, defendant Michelson saw House produce his electronic control device, or taser.  (Plaintiff's granddaughter testified that House looked "mad" as he stood up.  A.M. Dep., dkt. #59, at 24-25.)  House believes that plaintiff was saying, "Tase me.  Tase me."  (Plaintiff denies that he said this.)  Michelson released plaintiff and House deployed the taser toward plaintiff's chest.

The probe hit plaintiff, but he does not recall any electrical current going through his body.  Surprised by what was happening, plaintiff stated, "What the fuck?" and attempted to take the probes out of his chest by swinging his arms in a circular motion.  (It is not clear whether either defendant heard what plaintiff said.)  As he did so, he backed away from defendants.  Defendant Michelson deployed her taser, which again hit plaintiff's chest.  Plaintiff felt pain, but he does not recall whether he felt any electrical current.

Plaintiff disconnected the taser wires from his body.  Plaintiff says that he was afraid and "started going towards the other side of the street."  Pullen Dep., dkt. #33, at 106.  Plaintiff's daughter says that plaintiff was "stumbling backwards."  M.P. Dep., dkt. #37, at 34.  Defendant House says that plaintiff "took off running."  House Dep., dkt. #45, at 22.  Defendant Michelson says that plaintiff was "kind of stumbling, running."  Michelson Dep., dkt. #49, at 96.

18

Defendant House reloaded his taser as defendant Michelson headed toward plaintiff, attempting to cut him off.  Plaintiff reached a snow bank.  House says that plaintiff turned and started advancing toward Michelson, but Michelson does not remember plaintiff turning toward her.

Defendant House deployed his taser again, hitting plaintiff's back.  Plaintiff fell face forward onto the street. Defendants handcuffed plaintiff while he was lying on his stomach.  Michelson tugged on plaintiff's pants to roll him over and then started going through his pockets, pulling out his identification and money.  Michelson was pushing and pulling plaintiff around, which was painful for him.

Defendants pulled plaintiff off the street and called an ambulance because plaintiff had sustained injuries to his head and face, causing a lot of bleeding.  (Defendants were unable to check on the girls at that time because they had fled the scene by the time defendants had detained plaintiff.)  At the hospital, defendants gave plaintiff a citation for "resisting," but the charge was later dismissed.

2.  <u>False arrest claim</u>

Both sides seek summary judgment on this claim.  To the extent there are disputes or ambiguities in the facts, I must draw all reasonable inferences in plaintiff's favor for the purpose of defendants' motion for summary judgment and in defendants' favor for the purpose of plaintiff's motion for summary judgment.  <u>Loudermilk v. Best Pallet Co., LLC</u>, 636 F.3d 312, 314-15 (7th Cir. 2011) ("When ruling on a motion for summary judgment,

19

the party opposing the motion gets the benefit of all facts that a reasonable jury might find.").

On a claim for false arrest, the question is whether the officers were aware of facts supporting a reasonable belief that the suspect was committing a crime.  In legal parlance, this is called probable cause.  Abbott v. Sangamon County, Illinois, 705 F.3d 706, 713-15 (7th Cir. 2013); Mustafa v. City of Chicago, 442 F.3d 544, 547 (7th Cir. 2006); Kelley v. Myler, 149 F.3d 641, 646 (7th Cir. 1998).  Because defendants are raising qualified immunity as a defense, the question in this case is whether "a reasonable officer could have mistakenly believed that probable cause existed."  Thayer v. Chiczewski, 697 F.3d 514, 524 (7th Cir. 2012).  This is often referred to as "arguable probable cause."  Fleming v. Livingston County, Illinois, 674 F.3d 874, 880 (7th Cir. 2012); Carmichael v. Village of Palatine, Illinois, 605 F.3d 451, 459 (7th Cir. 2010); Williams v. Jaglowski, 269 F.3d 778 (7th Cir. 2001).

Defendants argue that they had probable cause to arrest plaintiff for two offenses: (1) resisting an officer, in violation of Wis. Stat. § 946.41; and (2) aiding and abetting child abuse, in violation of Wis. Stat. § 948.03.  (Plaintiff was not cited for violating § 948.03, but that is irrelevant under the Fourth Amendment.  Sroga v. Weiglen, 649 F.3d 604, 608 (7th Cir. 2011) ("The existence of probable cause to arrest a suspect for any offense, even one that was not identified by the officers on the scene or in the charging documents, will defeat a Fourth Amendment false-arrest claim.").)  The parties do not identify the moment that defendants arrested plaintiff, but I need not resolve that issue because it does not affect the

20

resolution of the parties' motions.  Both sides assume that defendants win on this claim if they show that they had probable cause to arrest plaintiff at any point during their interaction with him.

a.  Defendants' motion for summary judgment

1) resisting

Under § 946.41(1), "whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor."  Defendants say that they had probable cause to arrest plaintiff for resisting, first because he refused to comply with their orders to get back in his car, get off his cell phone and produce his identification, and second because he resisted their attempts to handcuff or otherwise detain him.  Defendants also point to plaintiff's exiting his vehicle and moving toward defendant Michelson after he exited as facts supporting a violation of § 946.41, but they do not explain how either of those acts qualify as "resisting," so I have not considered those facts.  Even assuming that plaintiff started walking toward Michelson, it is undisputed that plaintiff complied with her command to stop advancing and move to the rear of his car.  Defendants do not argue that they had probable cause to arrest plaintiff for "obstruct[ing] an officer," so I do not consider that question.

With respect to plaintiff's refusal to comply with defendants' orders, I cannot grant defendants' motion for summary judgment because of the dispute regarding whether defendant Michelson had reasonable suspicion to stop plaintiff.  (Defendants do not argue

21

that defendant House should be treated differently on the ground that he assumed reasonably that Michelson's stop was lawful, so I do not consider that question.)  "[B]y its very terms, Wis. Stat. § 946.41(1) requires an officer to have 'lawful authority' before a citizen can be charged with resisting an officer."  State v. Annina, 2006 WI App 202, ¶ 18, 296 Wis.2d 599, 723 N.W.2d 708.  "'[L]awful authority,' as that term is used in Wis. Stat. § 946.41(1), requires that police conduct be in compliance with both the federal and state Constitutions, in addition to any applicable statutes."  State v. Ferguson, 2009 WI 50, ¶¶ 15-16 767 N.W.2d 187, 194, 317 Wis. 2d 586, 600.

If defendants did not have lawful authority to detain plaintiff under the Fourth Amendment, then it follows that they did not have lawful authority to give him orders either.  Brunner v. McKillip, 488 F. Supp. 2d 775, 784 (W.D. Wis. 2007) ("Without lawful authority to make [a] demand in the first place, [an officer] would have no probable cause to believe plaintiff was violating § 946.41(1) by ignoring his directive.").  See also United States v. Brewer, 561 F.3d 676, 678 (7th Cir. 2009) (person not seized under Fourth Amendment "doesn't have to answer the officer's questions—he can turn on his heels and walk away").  Defendants point to no Wisconsin statute or other law that would require an individual to comply with an officer's orders under those circumstances.  Accordingly, construing the facts in plaintiff's favor, it was clearly established that defendants could not arrest plaintiff for refusing to comply with their orders.

I reach the same conclusion with respect to plaintiff's attempts to free himself from defendants.  If defendants had no authority to stop plaintiff and no authority to give him

orders, then they had no authority to attempt to handcuff him for refusing to comply with those orders.  Annina, 2006 WI App 202 at ¶ 18.

Defendants cite two cases in support of a contrary conclusion, but neither case is instructive.   In Brooks v. City of Aurora, Illinois, 653 F.3d 478, 484 (7th Cir. 2011), the plaintiff had engaged in some behavior similar to the plaintiff in this case (e.g., refusing to comply with an attempt to handcuff him), but the Illinois statute at issue in Brooks does not contain the limitation that the officer must be exercising lawful authority, a point the court of appeals emphasized in its opinion.  Id.  The second case, State v. Leggions, 2003 WI App 89, ¶ 14, 2003 WL 1090511, at *4, is a nonprecedential opinion in which the court concluded that the officer had detained the defendant lawfully under the community caretaker doctrine, so the officer's lawful authority was not an issue in the case.

When the facts are construed in plaintiff's favor, this case is more similar to Rooni v. Biser, 742 F.3d 737, 741-42 (7th Cir. 2014), in which the officer arrested the plaintiff after he pushed the officer's hands away while the officer was trying to detain him unlawfully (at least according to the plaintiff in that case).  The court stated, "If a jury  believes [the plaintiff's] account, then it would find that all [the plaintiff] tried to do was to disengage from [the officer's] assault.  As we have noted in the past, 'police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.'"  Id. (quoting Payne v. Pauley, 337 F.3d 767, 780 (7th Cir. 2003), and Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir. 1996)).  According to plaintiff, defendants did not tell him that he was under arrest or even that they were going to handcuff him, so his initial

23

response simply reflected his surprise and fear.  In addition, he denies that he took any aggressive actions against either defendant, but only attempted to escape what he viewed as an unlawful assault.  In light of Rooni and the language of § 946.41, I conclude that, under plaintiff's version of the facts, defendants are not entitled to qualified immunity on the issue whether they had probable cause to arrest plaintiff for resisting.

2) aiding and abetting child abuse

Under Wis. Stat. § 948.03(2)(b), "Whoever intentionally causes bodily harm to a child is guilty of a Class H felony."  Defendants do not argue that they had probable cause to arrest plaintiff for abusing a child, but they argue that they had probable cause to believe that plaintiff was aiding and abetting child abuse by "failing to report child abuse," "hindering a child abuse investigation" and "concealing evidence of child abuse."  Dfts.' Br., dkt. #24, at 8.

Defendants do not develop this argument in any of their briefs.  They cite State v. Williquette, 370 N.W.2d 282, 284 125 Wis. 2d 86, 89 (Ct. App. 1985), as supporting their theory, but in that case, the court stated that an element of aiding and abetting is that the individual "aided another in the execution of a crime."  Defendants do not explain how failing to assist defendants in conducting an investigation after the fact would have aided Mitchell in "executi[ng]" the crime of child abuse.  Further, plaintiff did not prevent defendants from checking on the girls at any time, but neither defendant made any attempt to check on them, asked plaintiff any questions about them or even told plaintiff that the

24

purpose of the stop was to investigate possible child abuse.

In Williquette, 370 N.W.2d at 285, 125 Wis. 2d at 90, the court found that aiding and abetting could include "a parent's intentional failure to protect a child" from another's abuse.  To the extent defendants mean to argue that they had probable cause to believe that plaintiff had intentionally failed to protect his daughter from abuse, that argument has no merit.  Defendants admit that they had "only minimal information before they attempted to detain" plaintiff.  Dfts.' Br., dkt. #24, at 7.  They point to no specific facts that would support a reasonable belief that plaintiff had hurt a child or intentionally failed to prevent someone else from hurting a child.  Because it is clearly established that "[p]robable cause requires more than a bare suspicion of criminal activity," Holmes v. Village of Hoffman Estate, 511 F.3d 673, 679 (7th Cir. 2007), it is clear that defendants are not entitled to qualified immunity on this claim.


b.  Plaintiff's motion for summary judgment

1) resisting

In considering plaintiff's motion for summary judgment, I must accept as true defendants' version of the facts that defendant Michelson had a reasonable suspicion that Mitchell had committed a crime and that Mitchell was in the car with plaintiff.  (Plaintiff does not develop an argument that, even if the traffic stop was lawful, defendants had no authority to detain him because they knew he was not a suspect, so I do not consider that question.)  Thus, the first question is whether plaintiff has shown that it is clearly established

that his refusal to obey defendants' order could not qualify as resisting under § 946.41 in the context of a lawful traffic stop. Plaintiff has not made that showing.

In his opening brief, he relies solely on Henes v. Morrissey, 533 N.W.2d 802, 805, 194 Wis. 2d 338, 346 (1995), and State v. Hamilton, 120 Wis. 2d 532, 356 N.W.2d 169 (1984), to support his argument that a failure to obey a lawful order cannot qualify as resistance under § 946.41. However, that argument has two problems. First, the issue in both Henes and Hamilton related to the term "obstructs" in § 946.41; the court did not consider the meaning of the term "resists," which is the only part of the statute at issue in this case. Second, the issue in Henes and Hamilton was limited to whether a citizen's refusal to identify himself could qualify as obstruction under § 946.41. The court held that it could not because the statute defines "obstructs" to mean "knowingly giving false information" or "knowingly placing physical evidence with intent to mislead" and remaining silent was neither of those things. Henes, 533 N.W.2d at 808, 194 Wis. 2d at 353-54. (Unlike the term "obstructs," the term "resists" is not defined in the statute.) The court did not hold more generally that a citizen has a right to refuse to comply with an officer's orders during a lawful stop.

In his reply brief, plaintiff adds a citation to Marshall ex rel. Gossens v. Teske, 284 F.3d 765, 771 (7th Cir. 2002), but the issue in that case was whether the plaintiff's decision to flee from the defendants could qualify as "knowingly" obstructing or resisting when the individual did not know that the defendants were police officers. In this case, plaintiff does not argue that he failed to comply with defendants' orders because he did not know that

they were police officers, so <u>Marshall</u> is not relevant.

Also in his reply brief, plaintiff argues for the first time that he had a right under the First Amendment to continue speaking on his phone, dkt. #65, at 9 (citing <u>American Civil Liberties Union of Illinois v. Alvarez</u>, 679 F.3d 583 (7th Cir. 2012)), but that argument is forfeited for the purpose of summary judgment because he did not raise it in his opening brief.  In any event, even in his reply brief, plaintiff does not cite any authority to support a view that, if the stop was lawful, he had a right to refuse defendant Michelson's order to get back in his car.

With respect to his attempts to free himself from defendants, plaintiff relies entirely on his argument that defendants did not have authority to handcuff him.  Plaintiff cites no authority for the view that, if the stop was lawful and plaintiff's refusal to comply with orders qualified as resisting under § 946.41, then defendants did not have lawful authority to handcuff him.

In sum, plaintiff has not shown that, under defendants' version of the facts, it was clearly established that defendants did not have authority to arrest him for resisting an officer in violation of § 946.41.  Accordingly, I am denying his motion for summary judgment as to this claim.


2) aiding and abetting child abuse

I am granting plaintiff's motion with respect to the issue whether defendants had probable cause to arrest him for aiding and abetting child abuse.  As discussed above,

27

defendants have not articulated any specific facts that would have justified a belief that plaintiff had abused a child or aided or abetted someone else in abusing a child.  Accordingly, I conclude that it is clearly established that defendants did not have probable cause to arrest plaintiff for those crimes.


3.  Excessive force

Both sides have moved for summary judgment on plaintiff's excessive force claims. Plaintiff says that defendant House used excessive force against him by delivering a knee strike to him and that both defendants used excessive force each time they used a taser on him.

The parties agree that plaintiff's excessive force claim is governed by the Fourth Amendment. Because plaintiff cited the Fourteenth Amendment as well in his amended complaint, defendants seek dismissal of plaintiff's "Fourteenth Amendment excessive force claim," Dfts.' Br., dkt. #24, at 9, but I am denying that request as unnecessary because there is only one set of facts and therefore only one claim.  Legal theories are not "claims" and, as noted above, do not have to be included in the complaint, so incorrect legal theories can be disregarded.  King v. Kramer, 763 F.3d 635, 642 (7th Cir. 2014) ("[N]o . . . amendment was necessary in order for [the plainitff] to argue a Fourth Amendment theory, because the facts required for that claim were in the complaint all along."); Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992) ("[T]he complaint need not identify a legal theory, and specifying an incorrect theory is not fatal.").  Thus, it is enough to say that I will

28

analyze plaintiff's claim under the Fourth Amendment because that is what the parties have done in their summary judgment briefs.

In evaluating a claim for excessive force under the Fourth Amendment, the general question is whether the force used was reasonable under all the circumstances. These circumstances include the severity of the suspected crime, the danger posed by the suspect and whether the suspect is "actively resisting arrest" or attempting to flee. Abbott v. Sangamon County, Illinois, 705 F.3d 706, 724-25 (7th Cir. 2013).

a. Defendants' motion for summary judgment

With respect to their motion for summary judgment, defendants do not respond to plaintiff's argument that it was clearly established that *any* force was unreasonable if defendants did not have probable cause to arrest him. Plt.'s Br., dkt.#21, at 19 (citing Reese v. Herbert, 527 F.3d 1253, 1273 (11th Cir. 2008), Gaddis v. Redford Township, 364 F.3d 763, 772-74 (6th Cir. 2004), and Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir. 1996)). See also Abbot, 705 F.3d 706, 727 n.4 (7th Cir. 2013)("[If] the only fight [the suspect] put up was to defend himself against excessive force . . . our case law holds that use of unnecessary force on one who resists only that force can constitute excessive force."). Under plaintiff's version of the facts, defendants did not have probable cause to arrest him and his only resistance was to protect himself, so I cannot grant defendants' motion for summary judgment on plaintiff's excessive force claims.

29

b.  Plaintiff's motion for summary judgment

For the purpose of considering plaintiff's motion for summary judgment, I will assume that defendants used excessive force against plaintiff and focus on the question whether plaintiff has shown that it is clearly established that defendants violated plaintiff's constitutional rights when viewing the facts in the light most favorable to defendants. Rooni, 742 F.3d at 740 (district court is permitted to "jump[] directly to the qualified immunity inquiry").

1)  Knee strike

Defendants say that defendant House delivered a knee strike to plaintiff because plaintiff had refused multiple orders to stop resisting and place his arms behind his back. Plaintiff does not allege that the knee strike caused him significant pain or discomfort.

In support of his motion for summary judgment on this issue, plaintiff quotes the statement in Clash, 77 F.3d at 1048, that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever" and the statement in Reese, 527 F.3d at 1273, that "[i]n the absence of probable cause, [the officer] was not justified in using any force against [the plaintiff]."  When the facts are construed in defendants' favor, neither of these cases show that House's knee strike violated clearly established law.

Clash is distinguishable because the plaintiff was in handcuffs and the court was required to accept as true that the officer's use of force was "wholly gratuitous."  Clash, 77

F.3d at 1048.  Clash was not refusing to comply with orders to be handcuffed.  Plaintiff's reliance on Reese is misplaced because it rests on an assumption that defendants did not have probable cause to arrest him.  As discussed above, if I accept defendants' version of events, then defendants had probable cause to arrest plaintiff for resisting at the time House delivered a knee strike, or at least plaintiff has not cited any law clearly establishing that defendants did not have probable cause.  Because plaintiff also fails to cite any authority for the view that the knee strike was clearly excessive under defendants' view of the facts, I cannot grant plaintiff's motion for summary judgment on this issue either.

2)  Taser strikes

Plaintiff relies primarily on Cyrus v. Town of Mukwonago, 624 F.3d 856, 859 (7th Cir. 2010), in arguing that it is clearly established that defendant House's first taser strike was unconstitutional.  However, in Cyrus, the only justification for using a taser initially was that the suspect refused to comply with a single order to leave private property.  In this case, plaintiff refused numerous orders.  In addition, defendants say that plaintiff struggled with them while they tried to place handcuffs on him and exhibited defiance by telling House, "Tase me."  Thus, construing the facts in defendants' favor, Cyrus is not sufficient to overcome a qualified immunity defense.

Plaintiff also cites Abbott, 705 F.3d 706, and Phillips v. Community Insurance Corp., 678 F.3d 513 (7th Cir. 2012), but these cases are distinguishable as well.  In Abbott, 705 F.3d at 731-34, the court concluded that an officer was not entitled to qualified immunity

31

on a claim in which the plaintiff alleged that the officer used a taser after the plaintiff had been subdued.  In Phillips, 678 F.3d at 524-25, the court denied qualified immunity on a claim that officers shot the plaintiff with a baton launcher when the plaintiff refused to exit her car.  Neither of those cases involved the level of resistance alleged by defendants in this case.

The same conclusion is required for the second and third taser strikes.  It is obviously true that using a taser once does not give an officer the authority to use a taser again for as many times as the officer sees fit.  Cyrus, 624 F.3d at 863 (rejecting argument that, "if [the officer's] first use of the Taser was reasonable, all other uses were necessarily appropriate").  However, defendants say that their first two taser strikes did not subdue plaintiff, but only made him more agitated and caused him to flee.  In addition, defendant House says that he believed that plaintiff was moving toward defendant Michelson before the third taser strike.  Thus, under defendants' version of the facts, plaintiff is not entitled to summary judgment on any of his excessive force claims.


4.  Failure to intervene

Plaintiff argues that defendant Michelson may be held liable not just for her own conduct but also for the knee strike and two taser strikes delivered by defendant House.  In cases like this one brought under § 1983, the general rule is that "each Government official . . . is only liable for his or her own misconduct."  Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).  However, in the context of excessive force claims, the Court of Appeals for the

Seventh Circuit has held that "[a] police officer can be liable for another officer's excessive force . . . if that officer had a realistic opportunity to intervene and stop the first officer's actions. A 'realistic opportunity' means a chance to warn the officer using excessive force to stop." Miller v. Gonzalez, 761 F.3d 822, 826 (7th Cir. 2014) (citations omitted).

Because I have concluded that plaintiff is not entitled to summary judgment against defendant House for any of House's uses of force, it follows necessarily that plaintiff is not entitled to summary judgment against defendant Michelson for failing to stop those uses of force. The remaining question is whether defendants are entitled to summary judgment on these claims.

Plaintiff does not explain in his briefs or proposed findings of fact how defendant Michelson could have stopped defendant House from delivering the knee strike or the last taser strike. With respect to the knee strike, plaintiff points to no evidence that House gave any warning, either verbally or otherwise, before the strike occurred. In his reply brief, plaintiff acknowledges that "Michelson may not have anticipated House would cho[o]se . . . to deliver a knee strike and, therefore, did not have an opportunity to intervene to prevent the knee strike." Dkt. #65 at 22. Although this seems to be a concession, plaintiff goes on to say that Michelson was "responsible" because she "initiat[ed] the use of force against Pullen by grabbing his arms." Id. However, plaintiff cites no authority for the view that he can prevail under a failure to intervene theory by showing that Michelson's previous actions triggered the events that led to House's use of force.

With respect to the last taser strike, plaintiff does not dispute defendants' proposed

33

finding of fact that defendant Michelson "could not see Officer House when he deployed his TASER."  Plt.'s Resp. to Dfts.' PFOF ¶ 79, dkt. #56.  (Although plaintiff disputes an identical proposed finding of fact that defendants included later in their supplemental facts, he does not cite any evidence to support the dispute, but instead refers the reader back to his response to defendants' proposed finding of fact no. 79.  Plt.'s Resp. to Dfts. Supp. PFOF ¶ 16, dkt. #66.)  In his reply brief, plaintiff says nothing about Michelson's alleged failure to stop House from delivering the last taser strike, so I conclude that plaintiff has abandoned that argument.  Accordingly, I am granting defendants' motion for summary judgment with respect to plaintiff's claims that Michelson violated his constitutional rights by failing to stop House from delivering the knee strike and last taser strike.

This leaves defendant House's first taser strike.  Plaintiff says that defendant Michelson saw House produce the taser and then she released her hold on plaintiff before House deployed the taser.  From these facts, a reasonable jury could find that Michelson had an opportunity "to warn [House] to stop."  Miller, 761 F.3d at 826.  Because it has been clearly established for many years that officers may be held liable for failing to stop another officer from using excessive force, e.g., Yang v. Hardin, 37 F.3d 282, 285 (7th Cir.1994), I conclude that defendants are not entitled to summary judgment on this claim.

D.  Municipal Liability

A municipality such as the city of Madison may be held liable under § 1983 only if the municipality has a policy that causes the constitutional violation.  Monell v. New York

34

City Dept. of Social Services, 436 U.S. 658, 692 (1978).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).

In this case, plaintiff argues that the city of Madison may be held liable for the defendants Michelson's and House's uses of force.  Plaintiff initially argues more broadly that the city "was the moving force behind the violation of Pullen's constitutional rights," Plt.'s Br., dkt. #32, at 28, but the only asserted violations plaintiff discusses in any of his briefs relate to the uses of force.  To the extent plaintiff means to argue that the city may be held liable for false arrest as well, he has forfeited that argument by failing to develop it.

Plaintiff asserts two theories of liability against the city.  First, plaintiff says that the city failed to properly train officers on the use of force generally and the use of tasers in particular.  Second, plaintiff says that the city failed to "supervise and discipline" its officers.

A city's failure to train its employees may qualify as a "policy" under § 1983 if the city has actual or constructive notice that its failure is likely to result in constitutional violations of the type allegedly suffered by the plaintiff.  Connick, 131 S. Ct. at 1359-60.  "The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution."  Id. (internal quotations omitted).  Courts have applied the same standard to a city's failure to supervise or discipline its officers. Kitzman-Kelley, on behalf of Kitzman-Kelley v. Warner, 203 F.3d 454, 459 (7th Cir. 2000) (failure to discipline); West

35

By and Through Norris v. Waymire, 114 F.3d 646, 651 (7th Cir. 1997) (failure to supervise); Quade v. Kaplan, 2008 WL 905187, at *16 (N.D. Ill. 2008) (failure to discipline).  Both sides apply the Connick standard to each of plaintiff's municipal liability claims, so I will do the same.

Some of plaintiff's arguments regarding the city's training point in different directions.  In his opening brief, plaintiff did not argue that the city's written policies fail to give adequate guidance regarding the use of force generally or tasers in particular.  Rather, he argued multiple times that defendants' taser strikes *violated* the police department's policies regarding the appropriate use of force.  Plt.'s Br., dkt. #32, at 23-24, 26-27, 31-32.  In particular, he cited a department policy stating that officers should not use a taser on individuals "who are offering only passive resistance" or on individuals "fleeing on foot" "unless exigent circumstances are present."  Plt.'s PFOF ¶ 96, dkt. #54.  At one point, he went so far as to say that defendants "clearly" violated department policy.  Plt.'s Br., dkt. #32, at 32.  Because plaintiff does not argue that the city did not provide its officers copies of the policy he cites, his argument that defendants violated the policy seems to undermine his other argument that the city is responsible for the alleged constitutional violations.

In his brief in opposition to defendants' motion for summary judgment and his reply brief in support of his motion for summary judgment, plaintiff takes a different approach, arguing that the city's policy is inadequate because it does not define the term "exigent circumstances."  Dkt. #55 at 37; dkt. #65 at 29.  This argument has multiple problems, the first of which is that it is inconsistent with plaintiff's argument that defendants' conduct

"clearly" violated department policy.  By plaintiff's own assertion, there was no causal connection between any ambiguity in the policy and the alleged constitutional violation because defendants should have known that exigent circumstances were not present, even in the absence of more specific language.  A second problem is that plaintiff admits in his brief and proposed findings of fact that the city provides training in which it "clearly defines" exigent circumstances "as a situation in which the officer believes that the individual will pose an immediate risk to [the] public if not immediately apprehended."  Plt.'s Br., dkt. #32, at 24.  See also Plt.'s PFOF ¶ 101, dkt. #54.  Again, plaintiff seems to be taking the position that the problem is not with the city's policies, but with defendants' failure to comply with those policies.

Plaintiff attempts to avoid the implications of his contradictory arguments by focusing on testimony from defendants in which they had difficulty articulating their understanding of an appropriate use of force and could not identify additional training they received regarding the appropriate use of force after they graduated from the police academy. Plaintiff's argument seems to be that defendants' testimony is proof that the city did not provide them adequate training.

Again, plaintiff's argument has multiple problems.  First, plaintiff acknowledges that defendants were trained on the appropriate use of force in the police academy and he does not identify any deficiencies with the training they received there.  He cites no authority for the view that a city may be held liable under § 1983 for failing to provide continuing education if the initial training was adequate.  Further, even if I assume that *defendants'*

training was inadequate, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." City of Canton, Ohio v. Harris, 489 U.S. 378, 390-91 (1989).  Although defendants make this argument in their opposition to plaintiff's motion for summary judgment, plaintiff does not address it in his reply brief, so he has conceded the argument.  Bonte v. United States Bank, N.A., 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

With respect to the city's alleged failure to supervise and discipline its officers, plaintiff again focuses on defendants in particular instead of the city's treatment of its officers generally.  Even if I assume that any failure by the city to supervise or discipline defendants could trigger municipal liability, the evidence plaintiff cites is not sufficient to support this claim.

Plaintiff alleges that the city did not adequately discipline defendants for department infractions or complaints that citizens made about them.  However, these complaints and infractions could be relevant only if they were related to conduct similar to that alleged in this case.  Connick, 131 S. Ct. at 1360 ("Because those incidents are not similar to the violation at issue here, they could not have put [the defendant] on notice that specific training was necessary to avoid this constitutional violation.").  This is a problem because plaintiff does not identify the subject matter of most of the complaints and infractions. Plaintiff says that one of the citizen complaints against Michelson was related to the use of a taser, but one incident is not enough to trigger municipal liability unless that incident

38

makes it "patently obvious" that failing to take additional action will lead to constitutional violations.  Id. at 1361.  In this case, plaintiff provides no details about the taser complaint and he makes no showing that the complaint had any merit, so he cannot meet the standard in Connick.  Valentino v. Village of South Chicago Heights, 575 F.3d 664, 675 (7th Cir. 2009) (rejecting argument that previous retaliation complaints showed that city had policy or custom of retaliation because plaintiff did "not contend that any of these alleged instances of retaliation ever resulted in a meritorious lawsuit or settlement").

Plaintiff points to defendants' testimony that they could not remember being notified about most of the complaints against them, arguing that the city has a "policy of failing to communicate regularly when complaints are made."  Plt.'s Br., dkt. #32, at 32.  In response, the city says that it investigates all complaints internally, but that officers may not be informed if the complaint is unfounded.  However, even if I assume that the city should have informed defendants of all the complaints against them, plaintiff fails to explain how any failure to "communicate" is a direct cause of the use of force in this case.  City of Canton, 489 U.S. at 385 ("Our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").  In the absence of any showing that defendants have used excessive force in the past, then it is not clear how informing defendants of unrelated or unfounded complaints could have caused them to use more restraint in this case.

Plaintiff also says that defendants were not disciplined by the city for their use of

force against plaintiff, but that fact cannot be used to impose liability on the city in this case. "[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates." Connick, 131 S. Ct. at 1360 n.7.  Finally, plaintiff points to an allegation of excessive force against House in 2012 and criminal charges against House in 2013 for disorderly conduct and operating a firearm while intoxicated.  Again, these incidents occurred after the events in this case, so they are not relevant to municipal liability.  Further, the criminal charges are not relevant because they are not related to excessive force and because plaintiff admits that the city suspended House without pay as a result.  Plt.'s PFOF ¶ 93, dkt. #54.  Plaintiff does not argue that the city's response was inadequate in any way.

In sum, plaintiff has not adduced sufficient evidence to permit a reasonable jury to find that city policy caused the alleged constitutional violations in this case.  Accordingly, I am denying plaintiff's motion for summary judgment and granting defendants' motion with respect to plaintiff's claim against the city.

### E.  State Law Claims

In addition to his claims under the Constitution, plaintiff asserts claims for assault and battery under state law.  Plaintiff did not move for summary judgment on his state law claims, but defendants seek summary judgment on the ground of state law privilege.  However, defendants admit that the privilege "is synonymous with the federal . . . standard which governs Fourth Amendment excessive force claims."  Dfts.' Br., dkt. #24, at 26.

Because I have concluded that defendants are not entitled to summary judgment on plaintiff's excessive force claims, defendants are not entitled to summary judgment on plaintiff's state law claims either.


## ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by plaintiff Marvin Pullen, dkt. #27, is GRANTED with respect to the issue whether defendants Colleen Michelson and Cary House had probable cause to arrest plaintiff for aiding and abetting child abuse.  Plaintiff's motion is DENIED in all other respects.

2. Defendants' motion for summary judgment, dkt. #23, is GRANTED with respect to plaintiff's claims that defendant Michelson failed to stop defendant House from delivering a knee strike and the last taser strike and with respect to plaintiff's claim against defendant City of Madison.  Plaintiff's amended complaint is DISMISSED as to the City of Madison. Defendants' motion for summary judgment is DENIED in all other respects.

Entered this 20th day of February, 2015.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

41